UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

AMADOU DIAKITE,

　　　　　　　　Petitioner,

　v.

DEBRA ASUNCION, Warden,

　　　　　　　　Respondent.

Case No.  2:16-cv-04256-DSF-KES

FINAL REPORT AND
RECOMMENDATION OF UNITED
STATES MAGISTRATE JUDGE

　　　This Report and Recommendation is submitted to the Honorable Dale S. Fischer, United States District Judge, pursuant to the provisions of 28 U.S.C. § 636 and General Order 05-07 of the United States District Court for the Central District of California.

## I.

## INTRODUCTION

　　　On June 14, 2016, Amadou Diakite ("Petitioner") filed his Petition for Writ of Habeas Corpus by a Person in State Custody pursuant to 28 U.S.C. § 2254 (the "Petition").  (Dkt. 1.)  Petitioner is a California state prisoner currently serving an aggregate sentence of sixteen years and four months after a jury convicted him of three counts of armed robbery of Craigslist sellers, and one count of possession of

marijuana for sale. (Petition at 2.[1])

Respondent filed an answer to the Petition on October 13, 2016. (Dkt. 17.) Petitioner filed a traverse on April 12, 2017. (Dkt. 30.) On August 9, 2017, the Court issued a Report and Recommendation ("R&R") recommending that the Petition be denied. (Dkt. 32.) Petitioner timely filed objections to that R&R on October 4, 2017. (Dkt. 35.)

The Court again recommends denying the Petition, but issues this Final R&R in order to address matters raised in Petitioner's objections. As discussed further below, the Court finds that Grounds 1-7 and 11-12 of the Petition are substantively without merit, and Grounds 8-10 are procedurally defaulted.

## II.

## FACTUAL BACKGROUND

Because Petitioner challenges the sufficiency of the evidence to support his convictions, the Court has independently reviewed the state court record. See Jones v. Wood, 114 F.3d 1002, 1008 (9th Cir. 1997). Based on that review, the Court adopts the factual summary from the unpublished California Court of Appeal decision on Petitioner's direct appeal as a fair and accurate summary of the evidence presented at trial. (Dkt. 18, 19, Lodged Document ["LD"] 11); see also People v. Diakite, No. B252501, 2014 WL 6679100 (Cal. Ct. App. Nov. 11, 2014). Unless rebutted by clear and convincing evidence, these facts may be presumed correct.[2] Tilcock v. Budge, 538 F.3d 1138, 1141 (9th Cir. 2008); 28 U.S.C.

---

[1] The "Petition" is the District-approved form for filing habeas petitions and a two-page attachment of additional grounds, both at Dkt. 1. All page citations to the Petition and documents other than the Clerk's and Reporter's Transcripts are to the CM/ECF pagination.

[2] References to "Defendant" in the Court of Appeal's decision have been replaced with "Petitioner." All footnotes from the Court of Appeal's decision have been renumbered to be consistent with the numbering of this R&R.

2

§ 2254(e)(1).

### *The Varma Robbery (Count 1)*

Remy Varma listed a MacBook Pro laptop computer for sale on Craigslist sometime before March 7, 2011. The computer was brand new, and still sealed in the original box. A prospective buyer sent him a text message from (323) 603–7076. The two exchanged text and phone messages and arranged to meet. The buyer changed the location several times, but they finally agreed to meet at 10:00 p.m. on March 7, 2011, at the Rainforest Café in Hollywood. Varma parked in the restaurant parking lot around 10:00 p.m. and got out of his car while using his iPhone 4 cell phone. A black male came over and identified himself as the buyer. Varma handed him the computer. The man asked Varma if his cell phone was an iPhone 4. Varma responded that it was. The man grabbed the phone out of Varma's hand and backed away. Varma began to follow him, but he stopped when the man pointed a gun at him. The man went into an alley behind the restaurant, where a car was parked. Varma thought the man got into the car and drove away, but he was not certain. Varma reported the incident to police in Hollywood the next day. Surveillance video of the incident showed Varma interacting with a person in a blue jacket.

After the robbery, Varma watched Craigslist to see if his computer was listed for sale. Within two days, he found an advertisement selling the same computer with the same specifications. The language in the advertisement was similar to the one Varma had placed, as was the listed price. A photo showed a brand-new Mac Book Pro on a "dingy" couch. The advertisement referred to the Hollywood location at the corner where Varma was robbed. On March 9, 2011, Varma e-mailed the ad to the investigating detective at the Hollywood Station. He also recorded a voicemail message left on his cell phone by the person who talked to him about buying his Mac Book Pro, and forwarded the recording to the detective.

Max Shmain worked at a cell phone store in Hollywood. He bargained with

*people for merchandise daily and had purchased many electronic items from*
*Petitioner over a period of six years. Shmain knew Petitioner as "Ahmad" and*
*"Blue." Shmain had a telephone number in his cell phone associated with*
*Petitioner, under "Blue." On January 4, 2011, Shmain received a text message*
*from Petitioner stating, "Please call me when you get a chance Pablo new*
*number."*

*Between March 8, 2011, and March 10, 2011, Shmain negotiated with*
*Petitioner to buy a Mac Book Pro 13 laptop computer by text. The computer was*
*brand new and sealed in the box. The text messages only indicated what "SIM"*
*card or phone number was sending and receiving the messages, but Shmain knew*
*they were from Petitioner. One text from Petitioner's number to Shmain also asked*
*if an iPhone 4 was "unlockable," i.e., whether it was usable through carriers other*
*than AT&T. Shmain responded no.*

*Later, Shmain got a text from Petitioner's number asking, "Do you have*
*Sean's number on Melrose?" Shmain knew a person named Sean who worked at a*
*cell phone store, so he gave Petitioner the name of the shop, "Dialnet." He*
*exchanged additional text messages with Petitioner's number about the price of an*
*iPhone 4. Eventually, Shmain bought a brand new MacBook Pro from Petitioner,*
*which he later sold on eBay.*

*On March 15, 2011, Shmain sent a text message to "Mr. Pablo" at*
*Petitioner's number, asking if he could get "some more new Apple laptops like*
*that?" He received a response, "K, I'll let you know." On March 21, 2011, Shmain*
*exchanged a series of text messages with Petitioner's number about Apple iPads.*
*Shmain did not buy any iPads or iPhones from Petitioner in March 2011.*

*Payam Kohanbashir and his co-worker, Sean, worked at Dialnet, a cell*
*phone store on Melrose. Petitioner was a customer there. Kohanbashir knew him as*
*"Blue." In March 2011, Petitioner came in with a newer black iPhone 4, trying to*
*activate service. At some point, Petitioner purchased a new SIM card from Dialnet.*

### *The Marcuse Robbery (Count 2)*

Four to five days before March 23, 2011, Marc Marcuse listed two iPad 2's for sale on Craigslist for $1,600 each. They were brand-new in sealed shrink wrap packaging. Marcuse was contacted on March 23, 2011, by phone call and text from a prospective buyer using the phone number (323) 603–7067 [sic]. They arranged to meet in front of Marcuse's apartment in the early afternoon on March 23, 2011. At around 1:30 p.m. Marcuse sent the buyer a text message saying, "I'll be home from 4:00 on…" The buyer did not show up, so they reset the meeting for 7:30 p.m., and then again for 11:00 p.m. Marcuse spoke to the prospective buyer by phone at around 7:30 p.m. It was the same male voice as in the earlier call. At around 11:20 p.m., the buyer texted that he had arrived and was waiting outside. Marcuse came outside with the iPads. The buyer was a young black male, age 18 to 25, with a dark hoodie closed tightly around his face. Marcuse handed him the iPads to inspect. The buyer asked if Marcuse had any iPhones, and Marcuse said no. The buyer backed away from Marcuse. He pulled up his shirt and displayed a handgun with a dark-colored handle in his waistband, told Marcuse he was a "lucky guy," and warned him not to follow. The buyer walked backwards 20–30 feet and then turned and walked quickly to a parked vehicle. Marcuse ran to his own vehicle and followed the vehicle, a light colored sedan, while calling 911. Police stopped the car and detained the driver, a male Hispanic. Marcuse immediately knew they had the wrong suspect and he had followed the wrong car. Marcuse videotaped the incident from the window of his upstairs apartment.

### *The Setiabudi Robbery (Count 3)*

On March 24, 2011, Heru Setiabudi had a Rolex Yachtmaster watch advertised for sale on Craigslist for $7,300. He received telephone calls and text messages from (323) 603–7076, expressing an interest in the watch. He spoke four or five times with a prospective male buyer who identified himself as Pablo. Pablo arranged to meet him in front of an apartment at 1826 South Hauser Boulevard.

*Setiabudi arrived at the location and parked. A dark-skinned black male, age 20 to*
*25, wearing a baseball cap over part of his face, approached Setiabudi's car and*
*got into the passenger seat. Setiabudi handed over the watch for the buyer to*
*examine. They agreed on a price of about $7,000 for the Rolex. The man took a*
*black gun from his left pocket. He took Setiabudi's iPhone and car keys. He told*
*Setiabudi that if he did not call the police, his car keys would be across the street.*
*He sounded different from the man Setiabudi had talked to on the phone. The man*
*took Setiabudi's watch, phone, and keys. He ran across the street, and got into the*
*rear passenger seat of a white or silver car with distinctive taillights. Setiabudi*
*reported the incident to police that day.*

*A few days later, Setiabudi received more text messages from (323) 603-*
*7076, telling him to meet at an Arco gas station, giving the address, 10 West East*
*La Brea North, and directions, "Make a left first light, and I'll meet you there by*
*the gas station."*

***The Attempted Robbery of Rivera (Count 6)***

*In March 2011, J.C. Rivera listed a Rolex watch on Craigslist for $4,500. On*
*March 28, 2011, Rivera received a text message from (323) 603–7076, asking*
*about the watch. He spoke with the prospective buyer, a male, and exchanged text*
*messages with him. They arranged to meet at a Starbucks in front of the USC*
*campus the same day, but the buyer texted him and asked to change the location to*
*a gas station off of LaBrea. Rivera was unfamiliar with the location, so he asked*
*the buyer to meet him at Pink's. When Rivera arrived, the buyer changed the*
*location to a nearby Baskin Robbins store, so Rivera left his vehicle at Pink's and*
*walked to the Baskin Robbins. Four male friends followed Rivera in a vehicle. At*
*the time, Rivera was six feet tall and weighed 340 pounds. Three of his friends were*
*also large.*

*Rivera saw Petitioner, walked over, and asked if he was the person he had*
*arranged to meet. Petitioner responded that he was. Petitioner was wearing a white*

*striped polo shirt and jeans. Rivera's friends got out of their car. Rivera got in the driver's seat, Petitioner got in the passenger's seat, and Rivera showed him the watch. Petitioner said he wanted to take the watch to a friend at a pawn shop to authenticate it. Rivera did not have time for that, so Petitioner asked if his friend could come to the Baskin Robbins to look at the watch.*

*Petitioner left. After a few minutes, he returned in the passenger seat of a gray Ford sedan driven by another male. Petitioner's companion got into Rivera's car, and Rivera showed him the watch. The friend said it looked like the real thing. He went back to the Ford sedan. Rivera got out of his vehicle, stood with his friends, and then approached the Ford and asked if they were still interested. Petitioner and his friend indicated they still wanted to take the watch to a pawn shop. Rivera declined and left. Over the next several days, they exchanged text messages negotiating the price of the watch. Rivera lowered the price to $2,000. When Petitioner offered $3,000 if Rivera would come to him for the sale because he could not get to Rivera's location in Covina, Rivera felt that he was being set up and stopped negotiating.*

*Rivera did not initiate a robbery report because he didn't believe Petitioner was trying to rob him. Petitioner did not threaten Rivera or display a weapon.*

### *The Investigation*

*The case was initially assigned to Detective Hankins, who obtained the March 6–8, 2011 mobile phone records for (323) 603-7076.*

*In March 2011, Detective Dave Vinton took over the case and investigated the phone records obtained by Detective Hankins. At the time, he was only aware of the Varma robbery. The (323) 603-7076 number associated with the Varma robbery was a prepaid phone with no subscriber information, so Detective Vinton investigated several of the numbers most frequently called from that number. He determined that one frequently called number ((323) 500-8046) belonged to Tenell Mantock in Long Beach and that another number ((213) 448-6567) belonged to*

Petitioner's mother with an associated address of 1436 North Vista, Hollywood. Further records searches associated Petitioner with the North Vista address, and provided a description matching that given by Varma. The North Vista address was within a block or two of the Rainforest Café where Varma was robbed.

On March 31, 2011, Detective Vinton set up surveillance at the North Vista address, searching for Petitioner. Before sending officers to the location, Detective Vinton called the residence and determined that Petitioner was not there. Around 2:00 p.m. or 2:30 p.m., Officer Adrian Maxwell saw Petitioner drive up in a white Ford Fusion with one male passenger. Petitioner parked and went inside. Officer Maxwell called Detective Vinton and informed him a suspect fitting the robber's description had arrived. Detective Vinton called the (213) 448-6567 number associated with the Vista Street address and spoke with Petitioner. He told Petitioner he needed to talk to him about Petitioner's recently stolen car. He asked Petitioner to come outside.

Officer Maxwell detained and handcuffed Petitioner when he came outside. Officer Maxwell removed a clear plastic baggie containing a green leafy substance which he believed was marijuana from the waistband of Petitioner's underwear. He removed a wallet and a white Apple iPhone from Petitioner's back pockets. He returned the cell phone to Petitioner's pocket and did not book it in evidence, which was not usual police procedure. Detective Vinton later took possession of the white iPhone as evidence. Petitioner's wallet contained $1,372 in currency, consisting of ten $100 bills, eighteen $20 bills, two $5 bills, and one $2 bill. The cash and baggie of suspected marijuana were booked into evidence. Jeremy Deshone, the black male passenger in Petitioner's car, was arrested with Petitioner. Detective Vinton was advised that Petitioner had been arrested. Officer Maxwell remained at the North Vista address to monitor the location.

On the same day, Detective Vinton discovered the Marcuse and Setiabudi robberies were connected to the same phone number as the Varma robbery.

8

*Following Petitioner's arrest, Detective Vinton showed Varma a photographic six-pack including Petitioner's photograph at position No. 2. Varma picked the individual in position No. 2 and wrote, "# 2 looks like him…" Vinton then prepared a search warrant affidavit containing details of Petitioner's arrest, the Varma robbery, Varma's six-pack identification, and the information he had learned about the Marcuse and Setiabudi robberies.*

*The search warrant was served at 1436 North Vista address about five hours after Petitioner's arrest. No one was home. Detective Vinton used keys recovered from Petitioner to gain access. Officers recovered an iMac, iMac keyboard, five containers containing a green leafy substance resembling marijuana, and one empty container. The clear plastic baggie recovered from Petitioner's waistband (item No. 1) and the six containers recovered from the bedroom (items Nos. 2-7) were booked into evidence. The baggie weighed 34.91 gross grams. Item Nos. 2, 3, 4, 5, and 6 weighed 607 gross grams, 273 gross grams, 369 gross grams, 51.99 gross grams, and 21.98 gross grams, respectively. Item No. 7 was empty. The leafy substances in container numbers 2 and 3 were determined to be marijuana weighing 214.88 net grams and 5.35 net grams, respectively. The baggie from Petitioner's waistband was determined to be marijuana weighing 33.02 net grams. No marijuana paraphernalia was recovered in the search.*

*On April 4, 2011, Petitioner's mother consented to a search of a storage locker at her North Vista apartment, where a loaded silver-colored revolver was recovered. The same day, Detective Vinton photographed the living room couch at the North Vista apartment, which appeared to be the same couch shown in the Craigslist posting for a MacBook Pro computer emailed by Varma to Detective Vinton on March 9, 2011.*

*Detective Vinton conducted a recorded interview of Petitioner in custody on March 31, 2011. Petitioner denied committing any robberies. Detective Vinton questioned Petitioner about a black cell phone recovered from Deshone, the man*

9

who was arrested with Petitioner. Detective Vinton thought the black cell phone belonged to Petitioner because there were photos of Petitioner on it. Petitioner said it was not his phone and that the photos of a young black male on that phone were not him, they were Deshone. Detective Vinton asked Petitioner for the number of his iPhone; Petitioner said he did not remember the number because he just got a new number a few days ago. Petitioner said it was possible the robber had used his new cell phone number to commit the robberies because he bought the SIM card associated with the number used. Petitioner denied having any nicknames.

Detective Vinton had called Petitioner's girlfriend, Tenell Mantock, and Petitioner's friend, Scott Thenen, prior to the interview. During the interview, Detective Vinton told Petitioner that both Mantock and Thenen had confirmed that (323) 603–7076 was his number, and that Mantock said he had the number for three months. Petitioner maintained that he did not rob anyone.

After Petitioner was arrested, Thenen received a call from the police in Hollywood saying that they had his car, a Ford Fusion. Thenen was friends with Petitioner and knew him only as "Blue." In March 2011, Thenen lent his car to Petitioner, usually for just a day but possibly for as long as a week. For about a year, Thenen had been buying marijuana from Petitioner once or twice a week. He paid $60 to $70 dollars at a time for a quarter ounce. He never exchanged use of his car for marijuana. Thenen communicated with Petitioner by texts and phone calls. No one other than Petitioner ever answered his phone. Thenen knew Petitioner kept two phone numbers at a time, one for calling women and another for business. If Petitioner left a phone in Thenen's car, Thenen would not have used it or allowed others to use it.

On March 31, 2011, the day Petitioner was arrested, Detective Vinton called the (323) 603-7076 number associated with the robberies, to see if the white iPhone would respond with a recorded message and associated name. The cell phone responded with an automated message. One or two days later, Detective Vinton

*called the number again and got a different message with Petitioner's voice saying*

*that he was in jail and needed bail money to get out. Detective Vinton recorded the*

*message.*

*On April 1, 2011, Vinton called Bernitha Meteyer, a friend of Petitioner's*

*who communicated with him frequently on the (323) 306-7076 number. Meteyer*

*testified that during the time she knew Petitioner, he was looking for work but she*

*did not know if he ever found work. She usually paid when they went out. Around*

*March 25, 2011, Petitioner wanted to borrow money from her to get a car. She did*

*not lend the money to him because he was not working.*

### *Identifications*

*On March 25, 2011, prior to Petitioner's arrest, Marcuse and Setiabudi each*

*separately identified a different suspect, Vincent Cleveland, shown in position No. 2*

*in a photographic six-pack, as the person who "looked like" the person who robbed*

*them. After Petitioner's arrest, Detective Vinton again met separately with Marcuse*

*and Setiabudi. He showed them a different six-pack with Petitioner's photograph in*

*position No. 2. Both witnesses wrote that the subject in position number 2 "looked*

*like" the person who took their property. Detective Vinton then played the*

*recording he had made of Petitioner's outgoing message on his iPhone and asked*

*whether it sounded like the guy who had robbed them. Both witnesses said the voice*

*sounded similar to the individual who robbed them.*

*Setiabudi testified at trial that the perpetrator was not present in the*

*courtroom. He was not sure the voice in the recording was the man who talked to*

*him or who met him and took his watch. Varma could not positively identify*

*Petitioner at trial. Marcuse identified Petitioner in court as the man who robbed*

*him, and Rivera identified Petitioner as the man who met him about his watch from*

*a photographic six-pack and at trial. He also identified Deshone as the friend who*

*was with Petitioner.*

*Detective Vinton did not send either the recording he made of Petitioner's*

*voice message on the white iPhone, or the recording sent in by Varma of the person*
*who wanted to buy Varma's computer, to forensics for a comparison analysis to*
*determine if they were the same person.*

### *Cell Phone Evidence*

*Detective Vinton obtained a search warrant and sent Petitioner's iPhone to*
*Apple to be unlocked on May 4, 2011. He received the unlocked cell phone back*
*from Apple on May 11, 2011. Detective Vinton went through the contents of the cell*
*phone. He did not delete any items, add any text messages, or intentionally alter*
*any items. He did make some calls on the cell phone, trying to obtain the identities*
*of the contacts in the phone and discern who previous calls were made to.*

*LAPD/SID retrieved the cell phone for analysis on May 17, 2011. SID*
*specialist Eric Wahlberg used various forensics software tools to examine the*
*contents of the cell phone and generate reports of the contents, including contacts,*
*text messages, call logs, photos, and videos. Wahlberg testified that a SIM card is a*
*computer chip inserted into a cell phone, which the service provider uses to identify*
*the individual to be billed for the phone's usage. The SIM card is associated with a*
*particular telephone number, not with a particular device, because the SIM card*
*used in a device can be changed. Wahlberg's analysis was based on information he*
*retrieved from the cell phone, not from the SIM card. The cell phone can be used*
*without a SIM card.*

*The device name assigned to the white iPhone was "Blue." The cell phone*
*contained photos of a Rolex watch and internet searches for a Rolex Yachtmaster*
*watch. It contained more than 50 photos of Petitioner. A video stored in the cell*
*phone was played for the jury and transcripts of the audio content were supplied to*
*the jurors. The video was created or stored in the phone on or about July 19, 2010.*
*It showed Petitioner and another young black male smoking marijuana and talking*
*about wanting a Rolex watch, and taking one from the first "cracker."*

*Google Maps information stored on the cell phone showed that either the*

*phone was physically located at 1826 Hauser Boulevard in Los Angeles at some point in time or that the phone was used to search for the Hauser address location. Entries in the cell phone's contact list included "ZH marc i-pad, number is 1-323-841-4044" and "Z Rolex, and the number is 626–864–3285," Setiabudi's number. An incoming text message in the phone from "ZH marc i-pad" said, "I will be home from 4[:00] on…" Additional text messages between the white iPhone and "ZH marc i-pad" indicated an agreement to meet at 11:00 p.m. There were no call logs in the cell phone for any date prior to March 31, 2011. Wahlberg testified that calls can be deleted, cell phone memory can be wiped clean, and data can be changed. The cell phone could have been erased from March 30, 2011, and before. If a cell phone is not locked or password protected, it can be used by anyone in possession of it. This particular phone contained an application called "I-Spoof" that would allow the phone's user to make calls without using the phone's SIM card; the user could imitate another phone number which would show up on the recipient's end, so that it seemed like the call was coming from a number different than the one actually being used. Putting a new SIM card in an iPhone would wipe out all of the previously existing data on the device.*

*Detective Vinton testified about cell phone records for the (323) 603-7076 number obtained from the carrier, Simple Mobile. The records showed a text message from Shmain on March 21, 2011, two days prior to the Marcuse robbery, inquiring, "What kind of iPad is that again?"*

*Detective Michael Saragueta, assigned to the LAPD Narcotics Division lab squad, testified that in his opinion, the marijuana was possessed for the purpose of sale.*

*At the close of evidence, the trial court took judicial notice that Petitioner was placed on probation on September 22, 2009, and remained on probation through March 25, 2011, and instructed the jury this fact could be considered with respect to Petitioner's responses on his medical marijuana application.*

(LD 11 at 3-13.)

## III.

## PROCEDURAL HISTORY

**A.    Trial Court Proceedings.**

On August 19, 2013, a Los Angeles County Superior Court jury convicted Petitioner of three counts of second degree robbery, one count of unlawful firearm activity, and one count of possession of marijuana for sale, finding true the allegations that a firearm was used to commit the robberies. (LD 1, 2 Clerk's Transcript ["CT"] 445-49.) On October 21, 2013, the trial court sentenced Petitioner to a total of sixteen years and four months in state prison. (2 CT 473-77.)

**B.    Direct Appeal.**

Petitioner appealed, arguing that (1) the trial court erroneously dismissed Prospective Juror No. 20, a black female, in violation of People v. Wheeler, 22 Cal.3d 258 (1978), and Batson v. Kentucky, 476 U.S. 79 (1986); (2) the trial court violated Petitioner's right to due process when it denied as untimely his motion for discovery of police officer personnel records under Pitchess v. Superior Court, 11 Cal. 3d 531 (1974), and trial counsel was ineffective for failing to make a timely Pitchess motion; (3) the trial court violated Petitioner's right to due process by admitting evidence of voice identifications obtained from playing an unduly suggestive audio recording of the outgoing message on Petitioner's iPhone; (4) the trial court violated Petitioner's rights to due process and a fair trial by admitting improper character evidence, namely a video from Petitioner's iPhone that showed Petitioner smoking marijuana and talking about getting a Rolex from a "cracker"; (5) there was insufficient evidence to support Petitioner's conviction for possession of marijuana for sale; and (6) the cumulative effect of these errors deprived Petitioner of due process. (LD 8.) The California Court of Appeal affirmed the judgment in a reasoned opinion on November 25, 2014. (LD 11.)

Petitioner sought further review in the California Supreme Court (LD 12),

1    but that court summarily denied his petition for review on February 25, 2015. (LD

2    13.)

3    **C.     State Habeas Petitions.**

4         On December 11, 2015, Petitioner filed a state habeas petition in the

5    California Court of Appeal raising seven claims. (LD 14.) Two of these claims were

6    raised on direct appeal: (1) the trial court denied Petition due process when it

7    denied his <u>Pitchess</u> motion as untimely and counsel was ineffective for failing to

8    make a <u>Pitchess</u> motion earlier; and (2) the trial court erred by admitting the video

9    from Petitioner's iPhone into evidence. (<u>Id.</u> at 3, 6.) Petitioner also raised five new

10   claims: (1) the trial court's <u>sua</u> <u>sponte</u> jury instruction on aiding and abetting as to

11   robbery violated Petitioner's rights to due process and a fair trial; (2) Varma's

12   identification of Petitioner should not have been admitted because it was obtained

13   using an unduly suggestive photographic lineup; (3) there was insufficient evidence

14   to support one of Petitioner's robbery convictions under an aiding and abetting

15   theory; (4) trial counsel was ineffective for failing to object on racial prejudice

16   grounds to the introduction of the iPhone video into evidence; and (5) appellate

17   counsel was ineffective for failing to raise these new claims on direct appeal.[3] (<u>Id.</u>

18   at 4-9.)

19        On January 11, 2016, a three-judge panel of judges on the California Court of

20   Appeal denied the petition. (LD 15.)  The appellate court found that Petitioner's

21   <u>Pitchess</u> and trial-court-error-regarding-the-video claims had been raised and

22   rejected on appeal.  (<u>Id.</u> at 1.)  The appellate court found that "Petitioner also raises

23   issues that could have been, but were not, raised on appeal."  (<u>Id.</u>)  Lastly, the

24   appellate court held that, to the extent the failure to raise these issues was

25   ───────────────

26        [3] Petitioner alleges that appellate counsel did not raise any of the claims
     presented in his state habeas petition on direct appeal. However, two of the seven
27   claims raised in Petitioner's state habeas petition were in fact raised by Petitioner's
     appellate counsel on direct appeal.
28

15

attributable to appellate counsel, Petitioner had no ground for a claim of ineffective assistance of appellate counsel. (Id.) One judge dissented because the judge would have "issue[d] an order to show cause, returnable in the trial court, solely as to petitioner's contention that his trial attorney's failure to timely file a Pitchess motion constitutes ineffective assistance of counsel." (Id.)

On February 23, 2016, Petitioner filed substantially the same petition in the California Supreme Court. (LD 16.) That court summarily denied the petition on May 11, 2016. (LD 17.)

On June 14, 2016, Petitioner filed his federal Petition, which raises twelve claims: the six claims raised on direct appeal (framed as seven separate grounds) and the five new claims raised in Petitioner's state habeas petition. (Petition at 5-9.)

## IV.

## CLAIMS

Ground One: The prosecution erroneously dismissed Prospective Juror No. 20, a black female, in violation of Petitioner's constitutional rights under People v. Wheeler and Batson v. Kentucky. (Petition at 5.)

Ground Two: The trial court violated Petitioner's constitutional rights when it denied as untimely his motion for discovery of police officer personnel records under Pitchess v. Superior Court, and trial counsel rendered ineffective assistance of counsel ("IAC") by failing to make a timely Pitchess motion. (Id. at 5-6.)

Ground Three: The trial court violated Petitioner's rights to due process and a fair trial by admitting evidence of voice identifications obtained from playing an unduly suggestive audio recording of the outgoing message on Petitioner's iPhone. (Id. at 6.)

Grounds Four and Seven[4]: The trial court violated Petitioner's rights to due

---

[4] Grounds Four and Seven raise the same claim. The Court addresses them together.

16

process and a fair trial by admitting into evidence a video from Petitioner's iPhone, because the evidence was likely to incite racial animosity against him and was more prejudicial than probative. (Id. at 6 and 7.)

Ground Five: There was insufficient evidence to support Petitioner's conviction for possession of marijuana for sale. (Id. at 6.)

Ground Six: The cumulative effect of the errors in Grounds One through Five deprived Petitioner of his constitutional rights to due process and a fair trial. (Id. at 7.)

Ground Eight: The trial court's sua sponte jury instruction on aiding and abetting as to the robbery counts violated Petitioner's rights to due process and a fair trial. (Id.)

Ground Nine: The trial court's admission into evidence of identifications based on an unduly suggestive photographic lineup violated Petitioner's rights to due process and a fair trial. (Id.)

Ground Ten: There was insufficient evidence to support Petitioner's robbery convictions under an aiding and abetting theory. (Id. at 7-8.)

Ground Eleven: Trial counsel rendered IAC by failing to object to the introduction of the iPhone video into evidence. (Id. at 8.)

Ground Twelve: Appellate counsel rendered IAC by failing to raise Grounds Seven through Eleven on direct appeal. (Id.)

## V.

## AEDPA STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996, as amended ("AEDPA"), Petitioner is entitled to habeas relief only if the state court's decision on the merits "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court" or "(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the

17

State court proceeding." 28 U.S.C. § 2254(d); <u>Cullen v. Pinholster</u>, 563 U.S. 170, 181 (2011).

The relevant state court decision is the last reasoned decision. <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 806 (1991). The relevant "clearly established Federal law" consists of only Supreme Court holdings (not dicta), applied in the same context that petitioner seeks to apply it to, existing at the time of the relevant state court decision. <u>Premo v. Moore</u>, 562 U.S. 115, 127 (2011).

A state court acts "contrary to" clearly established Federal law if it applies a rule contradicting the relevant holdings or reaches a different conclusion on materially indistinguishable facts. <u>Price v. Vincent</u>, 538 U.S. 634, 640 (2003). A state court "unreasonably appli[es]" clearly established Federal law if it engages in an "objectively unreasonable" application to the facts of the correct governing legal rule. <u>White v. Woodall</u>, __ U.S. __, 134 S. Ct. 1697, 1705-07 (2014) (rejecting previous construction of section 2254(d) that a state court decision involves an unreasonable application of clearly established Supreme Court law if the state court "unreasonably refuses to extend a legal principle to a new context where it should apply"). Habeas relief may not issue unless "there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the United States Supreme Court's] precedents." <u>Harrington v. Richter</u>, 562 U.S. 86, 103 (2011). "[T]his standard is 'difficult to meet,'" <u>Metrish v. Lancaster</u>, __ U.S. __, 133 S. Ct. 1781, 1786 (2013), as even a "strong case for relief does not mean the state court's contrary conclusion was unreasonable," <u>Richter</u>, 562 U.S. at 102.

The same standard of objective unreasonableness applies where the petitioner is challenging the state court's factual findings under 28 U.S.C. § 2254(d)(2). <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 340 (2003) ("[A] decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding."); <u>Taylor v. Maddox</u>, 366 F.3d 992, 999

(9th Cir. 2004).

In <u>Taylor</u>, the Ninth Circuit observed that a challenge under section 2254(d)(2) "may be based on the claim that the finding is unsupported by sufficient evidence ... that the process employed by the state court is defective ... or that no finding was made by the state court at all." <u>Id.</u> at 999 (citations omitted). To conclude that a state court finding was unsupported by substantial evidence in the state court record, the reviewing federal habeas court "must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record." <u>Id.</u> at 1000. To conclude that the state court fact-finding process was defective in some material way, the reviewing federal habeas court "must be satisfied that any appellate court to whom the defect is pointed out would be unreasonable in holding that the state court's fact-finding process was adequate." <u>Id.</u> Examples in this latter category are where the state court "makes evidentiary findings without holding a hearing and giving petitioner an opportunity to present evidence," where the state courts "plainly misapprehend or misstate the record in making their findings, and the misapprehension goes to a material factual issue that is central to petitioner's claim," and where the state court "has before it, yet apparently ignores, evidence that supports petitioner's claim." <u>Id.</u> at 1001. "Once the state court's fact-finding process survives this intrinsic review ... the state court's findings are dressed in a presumption of correctness [.]" <u>Id.</u> at 1000.

All that said, "[e]ven in the context of federal habeas, deference does not imply abandonment or abdication of judicial review," and "does not by definition preclude relief." <u>Brumfield v. Cain</u>, __ U.S. __, 135 S. Ct. 2269, 2277 (2015) (quoting <u>Miller-El</u>, 537 U.S. at 340).

Here, the California Court of Appeal addressed Grounds One through Seven on direct appeal. Thus, for purposes of applying the AEDPA standard of review, this opinion is the relevant state-court adjudication on the merits for these claims.

19

See Johnson v. Williams, 568 U.S. 289, 297, n.1 (2013) (noting that federal habeas court "look[s] through" summary denial to last reasoned decision from state courts).

As for Grounds Eight, Nine, and Ten, the California Court of Appeal rejected these claims on habeas review because Petitioner could have, but did not, raise them on direct appeal. In California, this is a type of procedural default known as the "Dixon bar." See In re Dixon, 41 Cal. 2d 756, 759 (1953) ("[H]abeas corpus cannot serve as a substitute for an appeal."). Federal habeas courts generally refuse to hear claims defaulted in state court pursuant to an independent and adequate state procedural rule. Coleman v. Thompson, 501 U.S. 722, 750 (1991). The Dixon procedural bar is such a rule. See Johnson v. Lee, __ U.S. __, 136 S. Ct. 1802, 1804 (2016). Assuming under Ylst (as this Court must) that the California Supreme Court rejected Petitioner's claims on the same ground as the California Court of Appeal, these claims are presumptively procedurally barred in federal court. Petitioner may only overcome this bar by showing cause for the default and prejudice resulting from it, or a fundamental miscarriage of justice. Coleman, 501 U.S. at 750. As discussed below under Section VI., Subsection G., Petitioner has failed to make such a showing.

Lastly, Grounds Eleven and Twelve, while not raised on direct appeal, are not subject to the same procedural bar as Grounds Eight, Nine, and Ten, because the Dixon rule does not apply to ineffective assistance of counsel claims. See Martinez v. Warden, 2012 WL 6147887, at *3 (C.D. Cal. Nov. 1, 2012) (citing In re Robbins, 18 Cal. 4th 770, 814 n.34 (1998)). The Court agrees with Respondent that the California Court of Appeal expressly rejected on the merits Petitioner's appellate IAC claim (Ground Twelve), but disagrees with Respondent that the court did the same "implicitly" with respect to Petitioner's trial IAC claim alleging counsel failed to object to the iPhone video (Ground Eleven). (See Dkt. 17 at 24, n.7.) Rather, in the Court's view, the California Court of Appeal did not address Ground Eleven. Therefore, the Court must determine whether there was any

20

"reasonable basis for the state court to deny relief." Richter, 562 U.S. at 98; see also Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003) ("Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which [a federal court] can determine whether a silent state-court decision is objectively unreasonable."). As for Ground Twelve, the California Court of Appeal's opinion on habeas review is the relevant state-court adjudication on the merits. See Johnson, 133 S. Ct. at 1094 n.1.

**VI.**

**DISCUSSION**

**A.** **GROUND ONE: Petitioner Is Not Entitled to Relief on His Batson Claim.**

Petitioner contends that the prosecutor's exercise of a peremptory challenge against Prospective Juror No. 20, a black female, violated his constitutional rights under Batson v. Kentucky. Specifically, Petitioner argues that the prosecution failed to provide a credible, race-neutral reason for challenging Prospective Juror No. 20, one of only three black prospective jurors. (Petition at 5.) This claim fails because the state appellate court reasonably found that Petitioner failed to make a prima facie showing of discrimination by the prosecutor.

**1.** **Relevant Trial Court Proceedings.**

The unpublished California Court of Appeal decision on Petitioner's direct appeal provides the following accurate account of the relevant trial court proceedings:

*The prosecutor exercised a peremptory challenge against Prospective Juror No. 20. Prospective Juror No. 20 was a single black female who had no children. She was a nursing student, and had not previously served on a jury. Prospective Juror No. 20 was questioned as follows:*

*"[Prosecutor]: Juror 20, if I proof [sic] all the elements to you and you believe them beyond a reasonable doubt, would you have any problem voting*

21

*guilty?*

 *"Prospective Juror 20: Uhm, I don't think so, but the sympathy part kind of, you know, I'm conflicted with that sometimes.*

 *"The Court: Let me give the instructions since I have to give you all the instructions. You're not to consider sympathy or prejudice. You're to decide the case on whether or not the evidence proves the case or not. So you can't be thinking, oh, my goodness, you know, I feel so bad, or I'm so nervous, you know, hold it against him, or anything like that. That's a—that takes away from the solemn obligation of the jury to make a decision based on what they think happened, what's been proven.*

 *"And, you know, again, you can have your private hat on ... your own time. You can feel any kind of emotion you want. We just want to make sure as a juror that you can keep that separate, not ignore that you feel certain things, but keep it from your decision, not let it affect your decision. So it's not—we're not telling you [that you] may not feel emotion. We are not saying that like that. We're saying you have to keep it separate from your deliberations and make your decision based on the evidence and the law. Does that make sense?*

 *"Prospective Juror 20: Yeah, it does.*

 *"The Court: Can you do that?*

 *"Prospective Juror 20: Yeah.*

 *"The Court: No one is telling you not to feel. Ladies and gentlemen, we need jurors who will make their decision regardless of how you feel based on what's been proven and what hasn't.*

 *"[Prosecutor]: You said earlier that you felt conflicted. Now that the judge gave you that additional explanation, do you not feel that same conflict?*

 *"Prospective Juror 20: I understand what I need to do as far as make a decision. And if it's proven beyond a reasonable doubt, that I should vote not guilty or guilty according to the prosecution or the defense, whatever is stronger.*

1       *"[Prosecutor]: And now that you understand that, do you think you can do*
2  *it?*

3       *"Prospective Juror 20: Yeah, I think so."*

4       *Several jurors were excused by both the prosecution and defense, and*
5  *Prospective Juror No. 20 was asked to take seat No. 9. The prosecution then*
6  *requested that Prospective Juror No. 20/9 be excused, and the defense moved as*
7  *follows:*

8       *"[Defense counsel]: At this point, I'd like to make a Batson Wheeler motion.*
9  *My client is black. And they're [sic] only two black jurors here in the courtroom.*
10 *There were a total of three. [O]ne was dismissed for cause. I don't believe [this*
11 *juror] said anything that, uhm— ... This juror, she indicated that she understood*
12 *she needs to—to when questioned about sympathy—I believe the first page of jurors*
13 *were not instructed that they're not to take sympathy as a factor, but your honor*
14 *had instructed her and she said that she would follow that.*

15      *"The Court: All right. [Prosecutor]?*

16      *"[Prosecutor]: Your honor, I based my decision on many factors, including*
17 *her age. She seems conflicted. It doesn't seem like she has a lot of life experience*
18 *and—in that ... situation. That is why I selected her or using [sic] a peremptory on*
19 *her.*

20      *"The Court: All right. Anything further?*

21      *"[Defense counsel]: No.*

22      *"The Court: All right. I'm going to find that there's no prima facie showing,*
23 *even though I asked her questions and explained to her that, you know, she couldn't*
24 *consider sympathy, the fact that she expressed it, she expressed it in a way that was*
25 *emotional. And she said she was conflicted. She wasn't matter of fact. She was*
26 *emotional. And under the circumstances, I don't think there's any indication that*
27 *the challenge was based on race, when, you know, regardless of my attempt to*
28 *rehab her, the prosecutor had strong reasons based on her statement to believe that*

*she could be swayed by anything outside the evidence. So it does not appear to me*

*that there's any showing that race was a consideration in this…"*

(LD 11 at 17-19; see also 3 RT 716-18 and 3 RT 728-29.)

**2.      The Court of Appeal's Decision.**

The Court of Appeal rejected Petitioner's claim. The appellate court stated the applicable state and federal standard and determined that the totality of the circumstances surrounding the peremptory challenge reveal no discriminatory basis for the prosecutor's exercise of a peremptory challenge. (LD 11 at 19-23.)

**3.      Applicable Law.**

The parties to a California criminal trial can challenge an unlimited number of prospective jurors "for cause" by arguing that the juror does not possess the necessary qualifications to serve. Cal. Code. Civ. Pro. § 228-29; People v. Black, 58 Cal. 4th 912, 916 (2014). The parties also have a limited number of "peremptory" challenges to prospective jurors. Cal. Code. Civ. Pro. § 231(c). Peremptory challenges are ordinarily exercised without a stated reason. Wheeler, 22 Cal. 3d at 283-84. However, the Equal Protection Clause forbids using peremptory challenges to exclude potential jurors solely on the basis of race. Batson, 476 U.S. at 89; see also Wheeler, 22 Cal. 3d at 283-84. During voir dire, therefore, a party can make a Batson motion in response to the other party's use of a peremptory challenge, and that motion triggers certain duties incumbent upon the trial court.

Trial courts must follow three steps in adjudicating claims of racial discrimination during voir dire:

> First, a defendant must make a prima facie showing that a peremptory
> challenge has been exercised on the basis of race; second, if that
> showing has been made, the prosecution must offer a race neutral basis
> for striking the juror in question; and third, in light of the parties'
> submissions, the trial court must determine whether the defendant has
> shown purposeful discrimination.

Snyder v. Louisiana, 552 U.S. 472, 476-77 (2008) (alterations omitted).

"[A] defendant satisfies the requirements of Batson's first step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred." Johnson v. California, 545 U.S. 162, 170 (2005). The defendant must show that "the totality of the relevant facts" gives rise to that inference. Batson, 476 U.S. at 93-94.

> To establish such a case, the defendant must first show that he is a member of a cognizable racial group, and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race. Second, the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits "those to discriminate who are of a mind to discriminate." Avery v. Georgia, 345 U.S., at 562, 73 S.Ct., at 892. Finally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race.

Batson, 476 U.S. at 96.

At Batson's first step, whether the defendant has made a prima facie showing of discrimination is a "mixed question of law and fact," and the trial court's finding is therefore accorded a "presumption of correctness" in the habeas context. Crittenden v. Chappell, 804 F.3d 998, 1006 (2015); see also Tolbert v. Page, 182 F.3d 677, 685 (9th Cir. 1999) ("A trial court's determination of whether a prima facie case of discrimination under Batson has been established is to be reviewed deferentially, on direct review for clear error, or in the habeas context, by application of the statutory presumption of correctness.").

At the second step of the Batson inquiry, i.e., once a prima facie case has been shown, "the burden of production shifts to the proponent of the strike to come

25

forward with a race-neutral explanation" for the strike. <u>Purkett v. Elem</u>, 514 U.S. 765, 767 (1995). That explanation need not be "persuasive, or even plausible." <u>Id.</u> at 768. "'[T]he issue is the facial validity of the prosecutor's explanation' and '[u]nless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral.'" <u>Id.</u> (citation omitted).

The third step of the <u>Batson</u> inquiry "requires the trial court to judge the persuasiveness of the prosecutor's explanation to determine whether the defendant has ultimately satisfied the burden of proving racial discrimination in the prosecutor's exercise of peremptory challenges." <u>Murray v. Schriro</u>, 745 F.3d 984, 1003 (9th Cir. 2014); <u>Purkett</u>, 514 U.S. at 768. "[I]mplausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination." <u>Miller-El</u>, 537 U.S. at 339 (citation omitted). The issue turns on whether the trial court finds the prosecutor's race-neutral explanations to be credible. <u>Id.</u>; <u>see also</u> <u>Murray</u>, 745 F.3d at 1003. "Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy." <u>Miller-El</u>, 537 U.S. at 339. Under AEDPA, a habeas petitioner may obtain relief only by showing the state court's conclusion that the prosecutor's race-neutral explanations were true to be "objectively unreasonable in light of the evidence presented in the state-court proceeding." <u>Id.</u> at 340 (quoting 28 U.S.C. § 2254(d)(2)).

**4.      The Court of Appeal Reasonably Rejected Petitioner's Claim.**

a.      The Court of Appeal's decision to apply step one of <u>Batson</u>, rather than step three, was a reasonable application of federal law.

The Court of Appeal assessed the trial court's <u>Batson</u> ruling under step one of the inquiry (i.e., whether Petitioner made a prima facie showing that a peremptory challenge was exercised on the basis of race) rather than under step

three (i.e., where the trial court assesses the persuasiveness of the prosecutor's explanation for using the peremptory challenge). This was not an unreasonable application of federal law. While the prosecutor did provide the trial court with a non-discriminatory basis for the peremptory challenge (3 RT 728), which normally happens at step two of the <u>Batson</u> inquiry, doing so did not move the trial court beyond the first step of the <u>Batson</u> inquiry.

Under Supreme Court precedent, the issue of whether the defense made a prima facie showing of discrimination is moot only when both of two conditions are satisfied: (1) "the prosecutor offers an explanation for the peremptory challenges," and (2) the trial court "rule[s] on the ultimate question of intentional discrimination." <u>Hernandez v. New York</u>, 500 U.S. 352, 359 (1991). In this case, the first condition was satisfied because the prosecutor offered an explanation for his use of the peremptory challenge. However, the second condition was not satisfied because the trial court did not decide whether the prosecutor intentionally discriminated against Prospective Juror No. 20 on the basis of race. Rather, the trial court concluded that the defense did not successfully make a prima facie showing that the peremptory challenge was race-based. (3 RT 728-29.)

As the Ninth Circuit has noted, "[t]he Supreme Court has not addressed a case where the prosecutor stated his reasons for the peremptory challenges, but the trial court did not rule on the genuineness of those reasons." <u>Carroll v. Galaza</u>, 414 F. App'x 65, 67 n.1 (9th Cir. 2011). Because the United States Supreme Court has not decided this issue, "the Court cannot say that the California Court of Appeal's conclusion that the prima facie inquiry was not moot was contrary to, or an unreasonable application of, clearly established federal law." <u>Shannon v. Giurbino</u>, No. 06-6173, 2013 WL 4501479, at *11 (C.D. Cal. Aug. 22, 2013) (footnote omitted).

Here, the trial court expressly found that there was "no prima facie showing… that the challenge was based on race." (3 RT 728-29.) Because the trial

court did not rule on the question of intentional discrimination, the appellate court reasonably applied <u>Hernandez</u> when concluding that <u>Batson</u>'s first-level inquiry was not rendered moot by the prosecutor's statement of non-discriminatory bases for the challenge. Thus, the Court of Appeal reasonably concluded that the relevant inquiry remained at the first step of the <u>Batson</u> process.

      b.     The Court of Appeal's finding that Petitioner had failed to make a prima facie showing of discrimination was a reasonable determination of the facts.

The Court of Appeal found that both Petitioner and Prospective Juror No. 20 are black and therefore "part of the same cognizable racial group." (LD 11 at 22.) The appellate court reasonably concluded, however, that Petitioner did not further satisfy the requirements of <u>Batson</u>'s first step, because he failed to demonstrate that "the totality of relevant facts" gave rise to an inference of discrimination. <u>Batson</u>, 476 U.S. at 93-94.

First, the appellate court found that there "was no pattern of strikes against black jurors," because at the time of the peremptory challenge, one prospective black juror had been removed for cause, and two black prospective jurors remained. (LD 11 at 22; 3 RT 728-29.) This determination was reasonable because, at the time of the challenge, there were too few black prospective jurors to make a meaningful assessment. (LD 11 at 22.) <u>See</u> <u>Miller v. Lewis</u>, No. 12-8709, 2014 WL 5475101, at *9 (C.D. Cal. Oct. 28, 2014) ("Petitioner does not make a statistical argument and could not do so, given the small numbers involved." (citing <u>United States v. Collins</u>, 551 F.3d 914, 921 (9th Cir. 2009) ("The lack of other African-Americans in the jury pool renders mathematical trends and patterns meaningless."))).

However, even if the prosecutor's use of a peremptory strike against one of three black prospective jurors were sufficient evidence of a "pattern," this would not give rise to the inference of discrimination after considering the other relevant circumstances. While a defendant can make a prima facie showing based on a

28

statistical disparity alone (see id. ("We have found an inference of discrimination where the prosecutor strikes a large number of panel members from the same racial group, or where the prosecutor uses a disproportionate number of strikes against members of a single racial group.")), a prima facie inference of bias arising from a statistical disparity may be dispelled by other relevant circumstances. See Batson, 476 U.S. at 96-97.

The appellate court properly found that "the totality of relevant facts," particularly the prosecutor's questioning of Juror No. 20 in voir dire, did not give rise to an inference of discrimination. Id. at 93-94. The prosecutor's questioning did not address the juror's race, explicitly or otherwise. Further, the answers provided by the prospective juror could reasonably be interpreted as race-neutral reasons for the prosecutor to remove the juror from the venire. The prosecutor asked Juror No. 20 if she would be able to follow the law, despite the fact that she felt "conflicted." The prospective juror was equivocal in her answer, responding "Yeah, I think so." Prospective Juror No. 20 was also very young, with no children and little life experience. (See LD 11 at 18-22; 3 RT 641; 3 RT 716-18.) See, e.g., Mitleider v. Hall, 391 F.3d 1039, 1048-49 (9th Cir. 2004) (juror's youth and limited life experience constituted race neutral reasons for striking her); United States v. You, 382 F.3d 958, 968 (9th Cir. 2004) (prosecutor's stated belief that a prospective juror "lacked the sufficient age and maturity level" constituted a valid, non-discriminatory reason to strike that juror); Miller, 2014 WL 5475101, at *12 (juror's lack of life experience and inconsistent answers to prosecutor's questions were legitimate race-neutral reasons for striking juror). In his objections, Petitioner argues that "there were other white jurors who were young and did not have a lot of life experience," but "the prosecutor did not challenge these jurors on the same grounds as use[d] for the challenge of Prospective Juror No. 20." (Dkt. 35 at 3.) This alone is insufficient to demonstrate a Batson violation in light of the totality of the circumstances.

Because there is no pattern of the prosecutor striking black jurors, nor can any discriminatory intent be inferred from the prosecutor's questioning of Juror No. 20, the Court of Appeal reasonably determined that the totality of the circumstances surrounding the peremptory challenge revealed no discriminatory basis for the prosecutor's exercise of the challenge. Therefore, the appellate court reasonably found that the defense failed to make a prima facie showing of discrimination, and that the trial court's ruling was not error. (See LD 11 at 23.) For all these reasons, this Court finds that Petitioner is not entitled to relief on Ground One.

**B.**     **GROUND TWO: Petitioner Is Not Entitled to Relief on His Claims of Pitchess Motion Error and Ineffective Assistance of Trial Counsel Based on Failure to File a Timely Pitchess Motion.**

Petitioner alleges that the trial court violated his rights when it denied as untimely his motion for discovery of police officer personnel records pursuant to Pitchess, and that trial counsel rendered IAC for failing to make a timely Pitchess motion. (Petition at 5-6.) Petitioner has consistently asserted that Detective Vinton knowingly made false statements in his affidavit for the search warrant that was used to recover "items essential to the prosecution's case," including marijuana, the iMac, and the iMac keyboard. (LD 11 at 25.)

Petitioner is not entitled to relief on part one of his claim because the denial of his request to file a Pitchess motion involved exclusively the application of California state law, and is therefore not cognizable on federal habeas review. Petitioner's claim of IAC fails because it was reasonably rejected by the Court of Appeal on the grounds that: (1) Petitioner failed to rebut the presumption that counsel's failure to make a timely Pitchess motion was a reasonable tactical decision; and (2) even if Petitioner's trial counsel was deficient for failing to make a timely Pitchess motion, this failure did not prejudice his defense.

**1.**     **Relevant Trial Court Proceedings.**

The unpublished California Court of Appeal decision on Petitioner's direct

appeal provides the following accurate account of the relevant trial court proceedings:

*Prior to trial, Petitioner moved to quash and traverse the search warrant on the basis that Detective Vinton made false or reckless statements in his affidavit in support of the warrant. At the hearing held on July 23, 2013, Petitioner asserted that Detective Vinton stated victim Remy Varma identified Petitioner as the person who robbed him, when in fact, Varma stated that a photo shown to him in a six-pack photographic line-up "looks like Petitioner based on eyes, facial hair, facial features. He looks similar to the person who stole my laptop and phone at gunpoint." Detective Vinton also stated in the affidavit that Petitioner's cell phone number was used in the robbery, and was also used in two other robberies, but that the victims of those robberies had not yet been shown photographic line-ups that included Petitioner's photo. This statement was inaccurate, because although the evidence connected Petitioner to the phone number, Petitioner was not the subscriber to the number. Detective Vinton omitted that the two victims of the other robberies had already identified Vincent Cleveland as the robber, and that Cleveland had been arrested and charged with the two robberies, which was also very misleading.*

*The prosecution argued that in addition to the statements he made, Varma circled Petitioners [sic] photograph, making a positive identification. Additionally, in the days surrounding the robbery, the cell phone in question had been used to make calls to Petitioner's mother's apartment, which Petitioner had given as his home address in prior police reports, and to a woman that Petitioner had a relationship with, so there was a connection between Petitioner and the number.*

*The trial court ruled:*

*"... I have to say, Detective Vinton, that I'm a little concerned at the language [d]ealing with the identification on page 5 of 6, 'Varma looked at the photographs and identified [Petitioner] as the suspect who had robbed him,' I think*

it probably would have been more accurate to indicate what the actual statement is. 'Number 2 looks like him based on eyes, facial hair, facial features. He looks similar to the person who stole my laptop and phone at gunpoint,' and indicated that the witness circled the person in position number 2 rather than just saying identified Petitioner as the suspect who had robbed him. But, nonetheless, even if I were to excise that portion and reweigh the evidence with the actual statements coming in, I'm satisfied that there is more than enough evidence for the magistrate to have issued the warrant based on the Petitioner's close proximity to the offense, the connection to the cell phone that he used, the fact that it's [connected to] the same address the Petitioner listed when he was previously booked in this matter. I'm satisfied there is a sufficient basis for the granting of the search warrant, even reweighing it and removing the statement that he identified that individual."

Petitioner concurrently moved to suppress evidence obtained through the warrant, through a warrantless search of his person made upon Petitioner's arrest, and evidence obtained through an allegedly consensual search of his mother's storage cabinet, which was located in a parking garage in her apartment building.5 The items seized pursuant to the warrant were essential to the prosecution's case, and included the iMac, iMac keyboard, and marijuana. Officers also observed the apartment and took photographs of it. The items seized from Petitioner's person were likewise critical, and included Petitioner's iPhone, approximately 33 grams of marijuana, and over $1,300 in cash. In the search of Petitioner's mother's storage cabinet, officers discovered a gun and ammunition.

Detective Vinton testified that Petitioner's mother consented to the search of her apartment and storage cabinet. [Augmented RT 29.] He and another detective went to Petitioner's mother's apartment on April 4, 2011. Petitioner's mother asked them to come in and allowed them to take some photographs. She also took

---

[5] This hearing began on July 23, 2011, and was continued on July 24, 2011.

*them to a storage cabinet in the parking area and voluntarily unlocked the cabinet,*
*which contained a gun and ammunition.*

*[¶] Detective Vinton also testified regarding probable cause to arrest*
*Petitioner. He stated that prior to Petitioner's arrest, Varma had provided*
*Detective Vinton the cell phone number the robber had used to contact*
*him. Detective Vinton obtained the phone and cell tower records for the phone*
*number on the day of the robbery, the day before, and the day after. Cell tower*
*information showed that the phone was used frequently in the area of the robbery,*
*which was a very short distance from Petitioner's mother's apartment.*
*Approximately 38 calls had been made at all times of the day and night to a woman*
*who Petitioner had been involved with in a relationship. Three to four calls had*
*been made to Petitioners mother's address. Petitioner had previously listed his*
*mother's address as his own in a police report concerning a stolen vehicle. Varma*
*gave a description of the robber that was similar to Petitioner, but with small*
*variances in height, weight, and age.*

*Petitioner's mother testified regarding the officer's search of her apartment*
*and storage cabinet, sometimes giving conflicting or inconsistent statements. The*
*officers knocked on her door and asked if she would speak to them and she replied*
*that she would. The officers came in, but she could not remember if she invited*
*them or if they just walked in. She could not remember if they looked around the*
*house. Petitioner's mother then testified that she did not give them permission to*
*search and that they did not give her any "papers." They went downstairs to the*
*parking lot to see her car, and gave her something to sign. She did not know what it*
*was because she does not read English. The storage cabinet was in the garage, but*
*she had never used it. She testified at one point that the cabinet had a small lock*
*and that she wanted the officers to break it. She also testified there was no lock, so*
*she told the officers it was unlocked, and they opened it. The officers found a gun in*
*the cabinet. She then testified that the officers gave her a paper to sign after the gun*

*was found. She did not read it, but she did sign and print her name. She was shown handwriting on the consent form, located above her name that appeared to be the same printing as in her name, but she testified that it was not hers. She was asked whether Petitioner later called her from jail and told her to say that the police forced her to open the cabinet. She did not remember the conversation, but it could have happened.*

*The court denied the motion after hearing Petitioner's mother's and Detective Vincent's testimony, and additional argument. The court ruled:*

*"This is clearly a credibility call. With regards to the witnesses that have testified, I did find Detective Vinton to be a credible witness. With regards to [Petitioner's mother], she's a relatively poor historian...*

*"In this matter, the [section] 1538.5 motion is respectfully denied. With regards to the items that were seized from the Petitioner, I find that it is pursuant to a lawful arrest. With regards to the items that are seized pursuant to the search warrant, they are presumptively lawfully seized, and I find that they are. And with regards to the search of the locker, I do find that consent was given."*

*The court additionally found that there was probable cause to arrest Petitioner at the time that he was arrested.*

*Following the court's ruling on the suppression motion, the following discussion ensued:*

*[Defense Counsel]: Your honor, my client wishes that I file a Pitchess motion based upon—*

*The Petitioner: I was also told that a Pitchess motion was going to be filed. And I believe it was actually told on the record that we were going to file a Pitchess motion a couple months ago.*

*The Court: This is a March 2011 offense date. So filing a Pitchess motion on day 1 of 10 for trial is untimely.*

*The case was called for trial on July 31, 2014. Defense counsel filed several*

34

*motions in limine that day, including motions to exclude evidence contained in*
*Petitioner's iPhone. Defense counsel asserted that Detective Vinton, who had*
*earlier stated that he booked the iPhone separately from other seized evidence, had*
*tampered with the iPhone and deleted a portion of the logged call history. The*
*prosecution's position was that the calls were deleted before the cell phone was*
*seized. The trial court denied the motions pertaining to the phone, stating that these*
*were matters for cross-examination.*
(LD 11 at 23-27; <u>see also</u> 1 CT 207-19; LD 5, Augmented RT 8-33; 2 RT C17-C37.)

### 2. The Court of Appeal's Decision.

The Court of Appeal rejected Petitioner's <u>Pitchess</u> claim and related ineffective assistance of counsel claim on direct appeal.  The appellate court explained that Petitioner's request for a <u>Pitchess</u> motion was late under California law, and that it could be inferred that Petitioner's counsel believed that the motion would not be useful. (LD 11 at 27-29.)

### 3. Petitioner Has Not Shown That He Is Entitled to Federal Habeas Relief Based on the Denial of His Request To File a <u>Pitchess</u> Motion.

#### a. Applicable federal law.

Federal habeas corpus relief is only available to persons in custody in violation of the United States Constitution or federal law. <u>Estelle v. McGuire</u>, 502 U.S. 62, 67-68 (1991). A violation of state law alone is not cognizable in a federal habeas corpus petition. <u>Id.</u> at 72.

Federal habeas relief is also unavailable when a petitioner merely alleges that something in the state proceeding was contrary to general notions of fairness or violated some federal right unless the Constitution or other federal law specifically protects against the alleged unfairness or guarantees the procedural right in state courts. <u>Middleton v. Cupp</u>, 768 F.2d 1083, 1085 (9th Cir. 1985).

Under the due process clause, "criminal prosecutions must comport with prevailing notions of fundamental fairness." California v. Trombetta, 467 U.S. 479, 485 (1984). "We have long interpreted this standard of fairness to require that criminal defendants be afforded a meaningful opportunity to present a complete defense. To safeguard that right, the Court has developed 'what might loosely be called the area of constitutionally guaranteed access to evidence.'" Id. (quoting United States v. Valenzuela-Bernal, 458 U.S. 858, 867 (1982)); see also Brady v. Maryland, 373 U.S. 83, 87 (1963) (holding that the Due Process Clause requires the government to produce to a criminal defendant favorable evidence material to their guilt or punishment). To establish a due process violation under Brady, a Petitioner must show three things: that the evidence was favorable to him (either because it is exculpatory or because it is impeaching); the evidence must have been suppressed by the prosecution either willfully or inadvertently; and Petitioner was prejudiced by the nondisclosure. Strickler v. Greene, 527 U.S. 263, 281-82 (1999).

b.      Petitioner is not entitled to federal habeas relief.

Petitioner's Pitchess claim is grounded entirely in California law, because the challenged ruling rests on the state law procedural requirement that "the defendant must give written notice of the hearing on a Pitchess motion at least [sixteen] court days before that hearing." (LD 11 at 27-28 (citing Cal. Evid. Code § 1043(a), and Cal. Code Civ. Proc. § 1005(b)).) Petitioner's claim in Ground Two thus fails to present a colorable claim for federal habeas corpus relief. Cassett v. Stewart, 406 F.3d 614, 624 (9th Cir. 2005); see, e.g., Jordan v. Clark, No. 10-3895, 2014 WL 266167, at *20 (C.D. Cal. Jan. 10, 2014) ("To the extent petitioner now is asserting trial court error in denying the Pitchess motion during trial, petitioner has not presented a federal constitutional claim on this issue. At most, petitioner's claim is a state law question which is not reviewable on federal habeas.").

While Petitioner does not specify which constitutional right he believes the trial court violated, to the extent he argues that the trial court's denial of his request

36

to file a <u>Pitchess</u> motion violated due process, Petitioner is not entitled to habeas relief. (Petition at 5-6.) A petitioner "may not 'transform a state law issue into a federal one merely by asserting a violation of due process...'" <u>Poland v. Stewart</u>, 169 F.3d 573, 584 (9th Cir. 1999) (quoting <u>Langford v. Day</u>, 110 F.3d 1380, 1389 (9th Cir. 1996)); <u>Little v. Crawford</u>, 449 F.3d 1075, 1083 n.6 (9th Cir. 2006) ("'We cannot treat a mere error of state law, if one occurred, as a denial of due process; otherwise, every erroneous decision by a state court on state law would come here as a federal constitutional question.'" (citation omitted)).

Petitioner appears to argue that the trial court's denial of his request to file a <u>Pitchess</u> motion prevented him from receiving material exculpatory and impeachment evidence, thereby violating his due process right to present a complete defense. Petitioner, however, cannot establish a due process claim under <u>Brady</u>, because he is unable to show that any evidence uncovered through <u>Pitchess</u> discovery would have been favorable to him. Petitioner's claim for habeas relief is not supported by any evidence or knowledge of actual reprimands or incidents contained in Detective Vinton's file, but only on speculation that the undisclosed records may have contained complaints filed against the detective, and that these complaints may have had impeachment value. <u>See</u> <u>Harrison v. Lockyer</u>, 316 F.3d 1063, 1066 (9th Cir. 2003) (holding that due process is not violated when a <u>Pitchess</u> motion is denied, because petitioner made no showing that the officer's file contained complaints material to the defense; <u>see also</u> <u>Gordon v. Puckett</u>, No. 00-601, 2010 WL 891265, at *11-12 (C.D. Cal. Mar. 7, 2010) (holding the same). Because Petitioner made no preliminary showing of materiality, the trial court did not violate his due process right to present a complete defense when it denied Petitioner's request to file a late <u>Pitchess</u> motion. The absence of any evidence that the requested files contained exculpatory documents requires that this Court reject Petitioner's <u>Pitchess</u> claim insofar as it is cognizable on due process grounds.

**4.     Petitioner Has Not Demonstrated That His Counsel Was Ineffective for Failing To File an Earlier <u>Pitchess</u> Motion.**

Petitioner further contends that trial counsel rendered IAC for failing to file a timely <u>Pitchess</u> motion to obtain Detective Vinton's personnel files, in light of the evidence that the detective made false statements in the search warrant affidavit that led to the search which uncovered "items essential to the prosecution's case." (LD 11 at 25; LD 8 at 76-83; LD 14 at 5, 52-58; LD 16 at 5, 52-58.) Petitioner asserts that his trial counsel should have filed a timely <u>Pitchess</u> motion to obtain the detective's personnel files and potentially discover more evidence that could have been used to attack Detective Vinton's credibility and strengthen Petitioner's suppression motion. (Petition at 6.)

a.     Applicable federal law.

A petitioner claiming ineffective assistance of counsel must show that counsel's performance was deficient and that the deficient performance prejudiced his defense. <u>Strickland v. Washington</u>, 466 U.S. 668, 687 (1984). "Deficient performance" means unreasonable representation falling below professional norms prevailing at the time of trial. <u>Id.</u> at 688-89. A court deciding an ineffective assistance of counsel claim need not address both components of the inquiry if the petitioner makes an insufficient showing on one. <u>Id.</u> at 697.

To show deficient performance, a petitioner must overcome a "strong presumption" that his lawyer "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." <u>Id.</u> at 690. Further, the petitioner "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." <u>Id.</u> The initial court considering the claim must then "determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." <u>Id.</u>

To meet his burden of showing the distinctive kind of "prejudice" required

by Strickland, the petitioner must affirmatively "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694; see also Richter, 562 U.S. at 111 ("In assessing prejudice under Strickland, the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently.").

AEDPA requires an additional level of deference to state court decisions rejecting ineffective assistance of counsel claims. "The pivotal question is whether the state court's application of the Strickland standard was unreasonable. This is different from asking whether defense counsel's performance fell below Strickland's standard." Richter, 562 U.S. at 101.

        b.     The Court of Appeal reasonably applied Strickland.

The California Court of Appeal denied Petitioner's IAC claim on direct appeal, opining that while "the record does not contain an explanation of why defense counsel did not move earlier for discovery under Pitchess … on a silent record we must reject the claim of ineffective assistance of counsel on direct appeal." (LD 11 at 29.) Petitioner argued in his state habeas petition that trial counsel's failure to move for a timely Pitchess motion was an omission with no reasonable tactical explanation. (LD 14 at 54.)

There is a "strong presumption" that counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." Strickland, 466 U.S. at 690. Here, Petitioner's desire to file a Pitchess motion was not supported by any evidence or knowledge of actual incidents contained in Detective Vinton's files, but only by speculation that the undisclosed

records may have revealed relevant complaints filed against the detective.[6] Trial counsel, therefore, could have reasonably made the tactical decision not to file a Pitchess motion, believing that such a motion would not be fruitful or helpful to Petitioner's defense. At best, Petitioner's claim alleges that counsel had nothing to lose by filing a timely Pitchess motion. However, as there is "no clearly established Supreme Court precedent establishing a 'nothing to lose' standard for ineffective-assistance-of counsel claims, habeas relief cannot be granted pursuant to § 2254(d) (1) …." Knowles v. Mirzayance, 556 U.S. 111, 122 (2009); see also Pierce v. Hartley, 370 F. App'x 851, 852 (9th Cir. 2010) ("Nor would competent counsel have moved to suppress just because there was 'nothing to lose.'"). Thus, the appellate court reasonably found that counsel's omission was not outside the "wide range of professionally competent assistance," and therefore did not rise to the level of constitutionally deficient performance.

Even if trial counsel's failure to file a timely Pitchess motion did constitute deficient performance, Petitioner is unable to show the requisite prejudice under Strickland. Petitioner argues, in essence, that a timely Pitchess motion would have uncovered evidence impugning Detective Vinton's credibility, and that, based on this evidence, the court would have granted Petitioner's motion to quash and traverse the search warrant and his suppression motion.

Petitioner's claim fails because he did not provide any evidence or argument,

---

[6] At trial, Petitioner's counsel asked whether Detective Vinton had "ever been the subject of an investigation for internal affairs," and Detective Vinton responded, "Ever, yes, I have." (7 RT 2819.) It was also established that Petitioner had filed a complaint against Detective Vinton for his conduct in the present case. (7 RT 2819.) At a sidebar, counsel indicated that she "intend[ed] to ask … whether or not those included fabricating false evidence." (7 RT 2820.) The trial court ruled that such testimony from Detective Vinton would be hearsay, and Petitioner instead should have elicited such testimony from a Pitchess witness. (2 RT 2820.) The number and nature of the investigations against Detective Vinton remained unclear.

beyond mere speculation, of what discovery a successful <u>Pitchess</u> motion would

have yielded. Mere speculation that a timely <u>Pitchess</u> motion would have been

granted and uncovered relevant evidence does not demonstrate a reasonable

probability that, but for trial counsel's failure to make the motion, the jury would

have reached a different verdict. <u>See</u> <u>Osumi v. Giurbino</u>, 445 F. Supp. 2d 1152,

1163 (C.D. Cal. 2006) ("[P]etitioner's mere speculation regarding evidence

possibly contained in the arresting officers' personnel files is manifestly insufficient

to demonstrate petitioner was in any manner prejudiced by trial counsel not filing a

<u>Pitchess</u> motion.").

    As for the motion to quash and traverse the search warrant, the trial court

admonished the detective for the identification procedures he used prior to

obtaining the warrant. However, the court ultimately found that the search warrant

was valid even if the detective's questionable representations in support of the

warrant were not considered (LD 5 at 15-16; LD 11 at 24; 2 RT 36-37). Thus, any

evidence that could be obtained through <u>Pitchess</u> discovery further diminishing the

credibility of the detective's identification procedures and the statements made in

support of the warrant would not have affected the trial court's ruling on the

validity of the search warrant.

    Moreover, a ruling in Petitioner's favor on the <u>Pitchess</u> motion would not

have affected the court's ruling on Petitioner's suppression motion. Petitioner

moved to suppress evidence obtained through the warrant, through the warrantless

search of his person, and through the allegedly consensual search of his mother's

storage cabinet. (1 CT 207-23.) The court denied Petitioner's motion, finding that

the items seized pursuant to the search warrant were lawfully seized, the items

seized from the warrantless search of his person were pursuant to a lawful arrest,

and the search of the storage cabinet was consensual. (2 RT C35-36.) Regarding the

search of the storage cabinet, the court found that its ruling on the suppression

motion was a "credibility call." The court found that, while Detective Vinton was a

credible witness, Petitioner's mother was a "relatively poor historian." (2 RT C36.) This conclusion was based on the fact that Petitioner's mother gave conflicting and inconsistent statements, and she did not remember significant moments from her interactions with Detective Vinton. (2 RT C17-30.) The appellate court reasonably concluded that, based on the trial record, Petitioner's mother's testimony was sufficiently lacking in credibility that the trial court could have reasonably denied Petitioner's suppression motion, even without considering the credibility of Detective Vinton. Thus, even if counsel had filed a timely <u>Pitchess</u> motion, and even if that motion had uncovered evidence damaging to Detective Vinton's credibility, it is unlikely that the trial court's ruling on Petitioner's suppression motion would have been different.

In his objections, Petitioner argues that his counsel's failure to file a <u>Pitchess</u> motion meant counsel was not "adequately prepare[d] to effectively cross examine Detective Vinton and uncover evidence to challenge his credibility." (Dkt. 35 at 5.) However, the record shows defense counsel thoroughly cross-examined Detective Vinton (7 RT 2821-39) and examined all of the relevant witnesses with regard to the detective's involvement in their pretrial identifications. (<u>See</u> 5 RT 1530-34, 1546 (witness Varma); 4 RT 1240-42, 1245, 1250-59, 1297-98 (witness Marcuse); 5 RT 1590-94, 1609, 1612, 1617-18 (witness Setiabudi); 4 RT 1330-32 (witness Rivera).)

Petitioner also objects that "trial counsel admitted to being ineffective in her motion for new trial." (Dkt. 35 at 5.) It is true that, in a "Supplement to Motion for New Trial" filed on October 21, 2013, Petitioner's counsel argued:

> [D]efendant's due process rights were violated due to ineffective assistance of counsel. Counsel failed to fully cross examine Detective Vinton regarding the telephone number used by Detective Vinton to reach the defendant on the date of defendant's arrest. Detective Vinton lied about the telephone number that he used and defense counsel did

not effectively cross examine him on that issue. This caused the defendant prejudice because it would have shown that Detective Vinton lied about speaking to the defendant inside of the residence prior to him being arrested because the number that he dialed was not the telephone number of the residence, as he so testified.

Due process further compels a new trial since Detective Vinton perjured himself on the stand in a way that prejudiced the defendant. Detective Vinton testifying [sic] falsely regarding what he did with the Iphone [sic] obtained from the defendant's person and the gun that was allegedly found in the carport area denied the defendant a fair trial and violated his constitutional rights.

Defense counsel was further ineffective for not filing a Pitchess motion to attack the credibility of Detective Vinton.

2 CT 469-70 [Dkt. 18-2 at 202-03]. This argument by Petitioner's own counsel is not binding on this Court or any other court considering whether counsel was ineffective. In light of the topics on which counsel did cross-examine Detective Vinton, and because there is no evidence that a Pitchess motion would have uncovered useful impeachment material, this Court cannot say that the California Court of Appeal unreasonably applied the Strickland standard.

For all these reasons, the Court of Appeal reasonably applied Strickland, and Petitioner is not entitled to relief on his ineffective assistance of counsel claim.

**C.** **GROUND THREE: Petitioner Is Not Entitled to Relief on His Claim That the Trial Court Admitted Unduly Suggestive Voice-Based Identifications.**

Petitioner contends that Detective Vinton's use of the audio recording from Petitioner's iPhone to obtain identifications of his voice as the robber's voice was unduly suggestive and therefore violated Petitioner's rights to due process and a fair trial. (Petition at 6.) Petitioner asserts, as he did on direct appeal, that the audio

43

recording unduly suggested the speaker was the robber because (1) it was a single-voice identification; (2) it was played directly after the victims were shown six-pack photographic lineups that included Petitioner; and (3) the content of the recording stated that the speaker was in jail, thereby suggesting that the speaker was the guilty party. (Petition at 6; LD 8 at 85.) This claim fails because the state appellate court reasonably concluded that (1) the voice-based identification procedure was not unduly suggestive, and (2) the totality of the circumstances indicates that the procedure was sufficiently reliable.

### 1.    Relevant Trial Court Proceedings.

On July 31, 2013, Petitioner filed a pretrial motion to exclude the evidence of the victims' voice identifications based on the iPhone recording. (2 CT 336-40.) The unpublished California Court of Appeal decision on direct appeal provides the following relevant facts from the hearing on Petitioner's motion, which was held on August 6, 2013:

*Petitioner contends that a recording of his voice, which was played to Marcuse and Setiabudi for the purpose of identification, was unduly suggestive and created a substantial likelihood of misidentification. The recording played for the victims was Petitioner's outgoing message on his iPhone, which stated: "Hi. You know who this is. Um, I'm in the hole right now. I'm locked up in jail. Anybody who could help me out, I would appreciate it. Leave your name and number after the beep, and I'll get back at you. Can you guys help with whatever money, lawyer, bails bond [sic], whatever. Thanks."7*

*Petitioner argues that the recording is unduly suggestive because it is a single-voice identification, it was played directly after the victims were shown photographic line-ups including Petitioner, and the content of the recording*

---

7 Petitioner changed his previous outgoing message to this one after being arrested.

*suggested that the voice was of the guilty party. Both victims had previously*

*identified Vincent Cleveland as the robber in an earlier photographic line-up.*

*At a hearing prior to trial, Detective Vinton testified that he met with*

*Marcuse on April 4, 2011, to show Marcuse a photographic line-up and play the*

*recording for him. It was Detective Vinton's practice to orally admonish witnesses*

*prior to asking them to look at a line-up or make a voice identification, and he*

*believed that he had done so with both Marcuse and Setiabudi.8 He showed*

*Marcuse the six-pack photographic line-up, from which Marcuse picked Petitioner*

*as someone who looked like the robber. He did not positively identify Petitioner as*

*the robber. He then played the voice recording for Marcuse, and asked whether he*

*recognized the voice as that of the robber. Marcuse stated that the recording*

*sounded like the person who robbed him. Detective Vinton also met with Setiabudi*

*on April 4, 2011, showed him the same photographic line-up, and then played the*

*same recording for him. Detective Vinton asked whether he recognized the voice as*

*that of the robber. Setiabudi said Petitioner looked like the robber, and that the*

*recording sounded like the robber.*

*The trial court ruled that the recording was not unduly suggestive. The*

*recording was played for each witness soon after admonitions were given in*

*connection with the photographic line-ups, and those admonitions carried over to*

*the recording. The witnesses were told that Detective Vinton only wanted them to*

---

[8] The trial court read the standard admonition given by Detective Vinton aloud: "In a moment I am going to show you a group of photographs. This group of photographs may or may not contain a picture of the person who committed the crime now being investigated. Keep in mind that hairstyles, beards, and mustaches may be easily changed. Also photos may not always depict the true complexion of a person. They may be lighter or darker in the photograph. Pay no attention to marks or numbers that may appear on the photos or any other differences in the type or style of the photographs. When you have looked at all the photos, tell me whether or not you see the person who committed the crime. Do not tell other witnesses that you have or have not identified anyone."

45

*identify a person if they actually recognized him as the robber. Any suggestiveness*

*created by the recording's statement that the person was in jail would be cured by*

*the admonition.*

(LD 11 at 29-30; <u>see also</u> 4 RT 1203-10, 1219-21.)

### 2. The Court of Appeal's Decision.

The Court of Appeal rejected Petitioner's claim, reasoning as follows:

*We do not believe that the procedure was so unduly suggestive as to lead to*

*irreparable misidentification. In our view, the procedure was reliable after*

*considering the totality of the circumstances. Both witnesses spoke to Petitioner*

*prior to being robbed, and interacted with him sufficiently to allow them to identify*

*his voice. Neither had been previously asked to identify Petitioner's voice, and both*

*stated that the recording sounded like the robber, evidencing a reasonable degree*

*of certainty. The witnesses had just been admonished that any of the photographs*

*they viewed may or may not be the robber, and it was clear when the detective*

*asked whether they recognized the voice as that of the robber the admonishment*

*applied to the voice identification, as well. Finally, the voice identifications were*

*made within less than two weeks of the robberies, when the victims' memories were*

*still fresh. The trial court did not err in its ruling.*

(LD 11 at 31-32.)

### 3. Applicable Federal Law.

Due process prohibits the admission of witness identifications obtained after

police have arranged identification procedures so impermissibly suggestive as to

give rise to a "very substantial likelihood of irreparable misidentification." <u>Perry v.</u>

<u>New Hampshire</u>, 565 U.S. 228, 232 (2012); <u>see also</u> <u>Simmons v. United States</u>, 390

U.S. 377, 384 (1968). Therefore, unduly suggestive identification procedures may

violate the defendant's due process rights. <u>See</u> <u>Manson v. Brathwaite</u>, 432 U.S. 98,

98-99 (1977). However, "it is the likelihood of misidentification which violates a

defendant's right to due process," rather than the fact of suggestiveness itself. <u>Neil</u>

46

1    v. Biggers, 409 U.S. 188, 198 (1972).

2            Courts employ a two-part analysis to evaluate whether an identification has
3    been irreparably tainted by an impermissibly suggestive pretrial identification
4    procedure. The first step is to determine whether the pretrial identification
5    procedure was unduly suggestive. Simmons, 390 U.S. at 384. In a photographic
6    identification procedure, this may occur when the procedure "emphasize[s] the
7    focus upon a single individual," thereby increasing the likelihood of
8    misidentification. United States v. Bagley, 772 F.2d 482, 493 (9th Cir. 1985).
9    Whether an identification procedure was unduly suggestive is a fact-specific
10   determination. Id. at 493. Although not all of the factors relating to the
11   identification of a photograph will apply to the identification of a tape-recorded
12   voice, "the general approach and the policy considerations . . . are essentially the
13   same." United States v. Kim, 577 F.2d 473, 482 (9th Cir. 1978). If the court finds
14   that the challenged identification procedure is not unduly suggestive, then the due
15   process inquiry ends. Bagley, 772 F.2d at 492.

16           If the court finds that the identification procedure is unduly suggestive, then
17   the second step examines whether the totality of the circumstances surrounding the
18   identification indicates that it was nonetheless reliable. See Neil, 409 U.S. at 199;
19   Simmons, 390 U.S. at 383. Factors considered in assessing reliability of a
20   photographic identification include: (1) the opportunity to view the criminal at the
21   time of the crime; (2) the witness's degree of attention; (3) the accuracy of any prior
22   description; (4) the witness's level of certainty at the confrontation; and (5) the
23   length of time between the crime and the identification. Neil, 409 U.S. at 199-200.
24   Where "the indicia of reliability are strong enough to outweigh the corrupting effect
25   of the police arranged suggestive circumstances, the identification evidence
26   ordinarily will be admitted, and the jury will ultimately determine its worth." Perry,
27   565 U.S. at 232. As in step one of the inquiry, while the factors considered in
28   assessing reliability of the identification of a tape-recorded voice may differ slightly

47

from those relevant to photographic identifications, "the general approach and policy considerations . . . are essentially the same." <u>Kim</u>, 577 F.2d at 482.

> **4.** **The Court of Appeal Reasonably Concluded That the Voice-Based Identification Procedure Used by Detective Vinton Was Not Unduly Suggestive.**

Petitioner argues that the voice identification procedure was unduly suggestive because: (1) his voice was the only voice played for the victims during the identification process; (2) the recording was played directly after the victims were shown the photographic lineups including a photo of Petitioner; and (3) the content of the recording suggested that the voice was that of the guilty party. (Petition at 6.)

The fact that witnesses were played a recording of only Petitioner's voice does not, on its own, render the identification procedure unduly suggestive. While the Supreme Court has held that "identifications arising from single-photograph displays may be viewed in general with suspicion," the extent to which the identification is suggestive depends, at least in part, on the surrounding circumstances. <u>See</u> <u>Simmons</u>, 390 U.S. at 383. For example, the court will consider whether the identification procedure subjected the witness to "coercive pressure," or allowed "care and reflection" in making an identification. <u>Manson</u>, 432 U.S. at 116. Further, the Fifth Circuit has held that the fact that a witness was played a recording of only one voice is not sufficient to constitute a violation of due process. Rather, there must be "additional facts, beyond that of the one man factor itself, which point[] towards the unreliability of the identification." <u>Roper v. Beto</u>, 454 F.2d 499, 502 (5th Cir. 1971) (<u>citing</u> <u>Palmer v. Peyton</u>, 359 F.2d 199 (4th Cir. 1966)).

In this case, Detective Vinton admonished the witnesses immediately prior to presenting them with the six-pack photographic identification. Within fifteen to twenty minutes of showing the witnesses the six-pack, Detective Vinton played the

recording from Petitioner's outgoing phone message. (4 RT 1206.) Detective

Vinton testified that he asked each witnesses to listen to the recording and "see if

[they] recognized it." (4 RT 1207.) The detective further testified that he did not say

anything else to the witnesses besides asking them to listen "to see whether or not it

sounded like the person who robbed [them]." (4 RT 1210.) He did not tell either

Mr. Marcuse or Mr. Setiabudi that they were obligated to make any identification.

(4 RT 1214.) The identifications each took place in the witnesses' homes. (4 RT

1210.) Nothing in the trial court record indicates that Detective Vinton pressured

either of the witnesses to make a positive identification. In this case, there are no

additional facts pointing towards unreliability, or suggesting that the detective

subjected the witnesses to any "coercive pressure." See Manson, 432 U.S. at 116.

Thus, the appellate court reasonably concluded that the single-voice nature of the

identification procedure did not render it unduly suggestive.

Further, the fact that the recording was played directly after the victims

viewed photographic lineups that included a photo of Petitioner did not render the

voice identification procedure unduly suggestive. The crux of Petitioner's argument

appears to be that playing a recording for a witness who has just identified the

robber from a six-pack photographic lineup unduly suggests to the witness that the

recording is of the individual who the witness has just identified. The California

appellate court reasonably concluded that any suggestiveness resulting from this

procedure was cured by the admonishment the detective provided shortly before

playing the recording. (4 RT 1201-21.) The admonishment informed the witnesses

that the person who committed the crime may or may not be presented to them for

identification, and they were not required to make any identification. (4 RT 1219.)

While the Detective did not explicitly state that the admonishment applied to the

voice identification, the two identifications occurred close enough in time (within

twenty minutes) that the admonishment provided prior to the photographic

identification would reasonably carry over to the voice identification. (4 RT 1206.)

Finally, the content of the recording does not render the identification procedure unduly suggestive. While the speaker does state that he is in jail, there is no other information provided that would impermissibly link the voice of the speaker to the Craigslist robber. For example, the recorded voice did not mention any details specifically related to the crime, such as discussing stealing electronics or Rolex watches. The mere fact that the speaker was in custody would not unduly suggest the conclusion that the voice was that of the robber.

**5.**     **The Court of Appeal Reasonably Concluded That the Totality of the Circumstances Indicates That the Voice Identification Procedure Was Sufficiently Reliable.**

Despite the reasonableness of the appellate court's conclusion that the voice-based identification procedure was not unduly suggestive, the "practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup, has been widely condemned." Stovall v. Denno, 388 U.S. 293, 302 (1967). To warrant federal habeas relief, however, a particular identification process must be more than somewhat suggestive; it must be "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." Simmons, 390 U.S. at 384. Therefore, even if Detective Vinton's voice identification procedure was unduly suggestive, the Court of Appeal reasonably concluded that the totality of the circumstances surrounding the identification nonetheless indicate that the identification was sufficiently reliable, and did not "give rise to a very substantial likelihood of irreparable misidentification." Perry, 565 U.S. at 232 (2012).

In its reasoning, the appellate court notes four factors supporting the reliability of the identifications: (1) both victims testified that they had heard the robber's voice in conversations both before and during the robberies, and had

interacted with him sufficiently to allow them to identify his voice;[9] (2) neither victim had been previously asked to describe the robber's voice, and both stated that the recording sounded like the robber, demonstrating a reasonable degree of certainty (4 RT 1206-07); (3) both witnesses were admonished by the Detective, prior to viewing the photographic lineups, that any of the photographs they viewed may or may not be the robber, and it was clear when the detective asked whether they recognized the voice as that of the robber that the admonishment applied to the voice identification (4 RT 1206); and (4) the voice identifications were made within two weeks of the robberies, when the victims' memories were still fresh (4 RT 1204). (LD 11 at 31-32.) This four-factor test is both consistent with the Supreme Court precedent set forth in <u>Neil v. Biggers</u> and fully supported by the trial court record. <u>See</u> <u>Neil</u>, 409 U.S. at 199-200 ("...the factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation."); (4 RT 1201-21.)

Moreover, any risk that the identification procedure adopted by Detective Vinton would result in a conviction based on misidentification was mitigated by the opportunity for rigorous cross-examination at trial. <u>See</u> <u>Simmons</u>, 390 U.S. at 384 ("The danger that use of the technique may result in convictions based on misidentification may be substantially lessened by a course of cross-examination at

---

[9] Mr. Setiabudi had spoken to the potential Craigslist buyer on the phone three or four times prior to the robbery. (4 RT 1207.) Mr. Setiabudi also testified that he had an approximately thirty-second conversation with the robber at the time of the robbery. (5 RT 1584.) Mr. Marcuse testified that he spoke with the potential Craigslist buyer on the phone at least three times prior to the robbery. (4 RT 1223-24; 1227-28; 1229.) Mr. Marcuse also testified that he had an in-person conversation with the robber at the time of the robbery. (4 RT 1231-34.)

trial which exposes to the jury the method's potential for error"). The defense had the opportunity to cross-examine Detective Vinton thoroughly regarding the identification procedures he used (4 RT 1204-1215; 7 RT 2821-26, 2831-38, 2843-44; 8 RT 3023-28, 3054), and was able to examine both Mr. Setiabudi and Mr. Marcuse regarding their pretrial identifications. (See 4 RT 1240-42, 1245, 1250-59, 1297-98 (witness Marcuse); 5 RT 1590-94, 1609, 1612, 1617-18 (witness Setiabudi).) Any potential suggestiveness in the voice-based identification procedure was explored by the defense and presented to the jury for evaluation, thus minimizing the possibility that Petitioner's conviction was based on misidentification.

For these reasons, Petitioner is not entitled to relief on Ground Three.

**D.**     **GROUNDS FOUR AND SEVEN: Petitioner Is Not Entitled to Relief on His iPhone Video Evidentiary/Due Process Claim.**

Petitioner contends that the trial court violated his rights to due process and a fair trial when it admitted into evidence a video from Petitioner's iPhone showing him "and his confederate" smoking marijuana and discussing getting Rolex watches from a "cracker," a derogatory term for a white person. (2 CT 380-91.) In Ground Four, Petitioner alleges that the video was more prejudicial than probative, as well as "stale and irrelevant" because it was taken a year before the crimes were committed. (Petition at 6.) In Ground Seven, Petitioner alleges that the video's admission as evidence deprived him of due process, because it was likely to incite racial prejudice against him. (Petition at 7.) Petitioner's claims are not cognizable on federal habeas review, and even if they were, his due process claim fails.

    **1.**     **Relevant State Court Proceedings.**

The unpublished California Court of Appeal decision on Petitioner's direct appeal provides the following accurate account of the relevant trial court proceedings:

*Prior to trial, the prosecution sought to introduce a portion of a video*

*recording, taken from Petitioner's iPhone, in which Petitioner and Deshone*
*discussed stealing a Rolex watch from a "cracker."[10] Both men were smoking*
*marijuana, and continually used profanity. The prosecution explained that the*
*video was relevant because Petitioner was charged with robbery of a Rolex in*
*count 3, and attempted robbery of a Rolex in count 6. The prosecution asserted that*
*it only wished to show the portion of the video in which the two men were*
*discussing stealing a Rolex, and not an earlier portion where Deshone appeared to*
*be lighting a marijuana cigarette. Defense counsel argued that the video was more*
*prejudicial than probative and that it was too old to be relevant to the crimes at*
*issue.*

     *The trial court stated: "… [I]t's on his phone a couple days after these two*
*alleged offenses. Even if it was recorded earlier, if it was on his phone and he kept*
*it on his phone and he talks about getting Rolexes from crackers and the two crimes*
*alleged involved robbery and attempted robbery of Rolexes, where's the prejudice?*
*[¶]…It certainly sounds like pretty strong evidence of intent as well as identity,*
*certainly intent… [¶] I don't see an argument as to how – if there's any prejudice*
*at all, how it would substantially outweigh what seems to me to be significant*
*probative value…I don't think it's cumulative."*

     *The court ruled: "I think weighing this under [Evidence Code Section] 352,*
*there's absolutely no reason to preclude the jury from hearing it. It's up to them to*
*decide what meaning and significance it has, not for me to keep them from hearing*
*about it. So that's denied."*

     *Defense counsel then stated, "It almost seems like a prior bad act that is*
*coming in, your honor."*

     *The trial court responded: "Well, it seems to me like it's significant evidence*
*of specific intent as well as identity and—well, normally prior acts have to involve*

---

[10] "Cracker" is a pejorative word for a Caucasian person.

53

*significant crimes if there's ... as much other evidence as the People maintain of eyewitness I.D. and he's talking specifically about, you know, getting Rolexes from crackers and it's on his phone three days after and—four days after the alleged offenses... I'm going to base my ruling on evidence of intent... I think the factors that make it relevant and probative and tie it to the Petitioner are so significant that the jury should hear it... [T]hat's my ruling."*

*Later, defense counsel asked to revisit the issue of the video to verify that the jury would not be shown the portion where the men were smoking. It was established that an early part of the video, in which Deshone was lighting a marijuana cigarette, would not be shown. The trial court further responded, "Well, if he's smoking what appears to be a joint while they're talking about this, then I'm going to find that the probative value significantly outweighs the prejudice. And I think it should be allowed. I don't think that's a reason to exclude it when he's making statements about taking Rolexes from crackers. [¶] If that's what he's smoking, marijuana, then it was his decision to be video'd while smoking marijuana, so I don't think he should have the benefit of having statements about taking Rolexs [sic] from crackers excluded. He made the decision to do this."*

*Defense counsel then requested that the recording be "sanitized" by presenting only the audio component to the jury, rather than the whole video. The prosecution objected because the video was needed to establish Petitioner was in the car, and that he was with Deshone, with whom he was later arrested. The camera movements were also important to understanding the audio. The trial court added that it "reflects an extremely cavalier attitude which I think the People have the right to show," and that the video was "not exactly an example of good citizenship."*

*Defense counsel again attempted to have the video excluded prior to trial, arguing that it was "stale" because it had been last modified on July 19, 2010, seven and a half months prior to the robberies. The trial court found that the*

1  *passage of seven and a half months was not great, and did not affect its*
2  *determination that the video was highly probative.*

3  *At trial, defense counsel objected to a transcript of the video that the*
4  *prosecution intended to offer as an aid to the jury, because it differed from the*
5  *defense's transcript. The trial court ruled that both parties could present their*
6  *individual transcripts to the jury, who would be told that they were merely offered*
7  *as an aid, not evidence, and may or may not be accurate.*

8  *The prosecution played a portion of the video for the jurors, who were*
9  *admonished that the transcript was only an aid, and that if there were any*
10  *discrepancies between the video and the transcript, the video was controlling.*

11  *The next day, the defense moved for mistrial on the basis that the prosecution*
12  *played a greater portion of the video than agreed, and that the transcript it*
13  *provided the jury was inaccurate. The trial court denied the motion, explaining that*
14  *it had only excluded the portion of the video in which Deshone was lighting a*
15  *marijuana cigarette, and that the prosecution had not shown that portion of the*
16  *video. The trial court stated that counsel should go over the transcripts together*
17  *and determine what corrections should be made. Defense counsel then moved to*
18  *show 0-23 seconds of the video where one of the men said something to the effect of*
19  *"…here we go, My Not Entertainment, we are about to show you…" and both men*
20  *were "doing a little show off for the camera." The prosecution objected on the*
21  *basis of the rules of completeness. The trial court identified the relevant law as*
22  *Evidence Code section 356, which provides that when part of a conversation is*
23  *offered into evidence by one party, the remaining portion may be admitted into*
24  *evidence by the adverse party. The trial court ruled, "I will let you show the 0 to 23*
25  *[seconds], but if that's your offer of proof, then [the prosecution] can then on*
26  *redirect show the whole thing because the whole point is putting on a show, they*
27  *can see the entire show. You can't have it both ways. If your theory is, it puts on a*
28  *show, then [Deshone], he is totally engaged in the conversation, which is part of*

*that show, and [the jury] should be allowed to see the whole thing. It's up to you if*

*you want to play the whole thing, but if you do play zero to 23 [seconds]. I will let*

*[the prosecution] play the whole thing because that's part of the show."*

*The defense played the first 23 seconds of the video for the jury, and the*

*portion that had been previously played by the prosecution, starting at 45 seconds.*

*The jury was provided with the defense's transcript of the video. The trial court*

*again admonished the jury that the video controlled if there were discrepancies*

*between it and the transcripts.*

*At the close of the prosecution's case, it requested to play the entire video.*

*Defense counsel argued that it still did not agree with the prosecution's transcript*

*of the video. The trial court allowed the prosecution to play the entire video, and*

*told defense counsel that to the extent the transcripts conflicted, counsel could*

*argue that in closing.*

*In closing, the defense argued that the video was made as entertainment only,*

*many months before the charged offenses. Deshone had talked about stealing*

*Rolexes; Petitioner said that doing so would be "lethal." The prosecutor argued*

*that the video was evidence Petitioner and Deshone intended to rob people of their*

*Rolexes.*

(LD 11 at 32-35; <u>see also</u> 2 RT 5-13; 2 RT 60-62; 3 RT 955-56; 6 RT 2241-44; 7

RT 2401-06; 8 RT 3087-97; 10 RT 3646-47, 3679-80.)

**2.      The Court of Appeal's Decision.**

The Court of Appeal rejected Petitioner's claim.  The appellate court

reasoned that, under California law, the trial court did not abuse its discretion in

concluding that the video's probative value outweighed any prejudicial effect, or

that California law permitted the prosecution to introduce the entire video when the

defense introduced a part of it.  (LD 11 at 36-38.)

### 3. The Court of Appeal Reasonably Rejected Petitioner's Claim.

    a.    Petitioner's evidentiary error claim concerns California law exclusively, and therefore is not cognizable on federal habeas review.

Petitioner asserts that the video was inadmissible under Cal. Evid. Code § 1101 as propensity evidence or under § 352 as more prejudicial than probative, because (1) the "racially inflammatory" content "injected a racial bias into his trial," and (2) the video was "stale and irrelevant" because it was taken a year before the crimes were committed. (Petition at 6-7.)

To the extent Petitioner contends that the admission of the challenged evidence violated California state evidentiary law, this assertion fails to give rise to a cognizable federal habeas claim. See Estelle, 502 U.S. at 67-68; Rhoades v. Henry, 638 F.3d 1027, 1034 n. 5 (9th Cir. 2010) ("[E]videntiary rulings based on state law cannot form an independent basis for habeas relief.").

The California Court of Appeal rejected Petitioner's argument that the state trial court abused its discretion by admitting the iPhone video into evidence. (LD 11 at 36.) The trial court found that the video was relevant because it showed Petitioner discussing stealing a Rolex from a "cracker" and robbery of a Rolex watch was the exact crime that Petitioner was charged with committing in count 3, and attempting to commit in count 6. The court overruled the various defense objections, finding the video was admissible to prove intent, and that, even if the video was a year old, it would retain strong relevance for that purpose. (2 RT 12-14.) Furthermore, Petitioner's defense rested largely on his assertion that someone else used his cell phone to orchestrate the robberies. The video stored on the iPhone linked Petitioner with the cell phone. Petitioner argues that the prejudicial effect of showing the jury video footage of him smoking marijuana, using profane language, and displaying a cavalier attitude toward the law substantially outweighed any probative value. However, the trial court carefully considered both the potential

prejudicial and probative effects of the video, and concluded that the evidence should be allowed. (2 RT 5-13). This Court is bound by the state appellate court's conclusion that the trial court did not err, as a matter of California law, in ruling that evidence was admissible under California Evidence Code §§ 1101(b) and 352. See Bradshaw v. Richey, 546 U.S. 74, 76 (2005); Medley v. Runnels, 506 F.3d 857, 862 (9th Cir. 2007).

        b.      The trial court's evidentiary ruling did not violate Petitioner's due process right to a fair trial.

Generally, a state court's decision to admit specific evidence is not subject to federal habeas review unless the evidentiary ruling violates federal law or deprives the defendant of a fundamentally fair trial. Estelle, 502 U.S. at 75 (finding federal habeas relief inappropriate where admission of evidence was not so unfair as to result in denial of due process); Dowling v. United States, 493 U.S. 342, 352 (1990) (analyzing "whether the introduction of this type of evidence is so extremely unfair that its admission violates fundamental conceptions of justice"); see also Payne v. Tennessee, 501 U.S. 808, 809 (1991). The categories of infractions that violate "fundamental fairness" have been defined "very narrowly." Dowling, 493 U.S. at 352. A habeas petitioner challenging an evidentiary ruling bears a "heavy burden" in demonstrating a due process violation occurred. Boyde v. Brown, 404 F.3d 1159, 1172 (9th Cir. 2005). "Evidence introduced by the prosecution will often raise more than one inference, some permissible, some not," and it is up to the jury to sort out the inferences in light of the court's instructions. Jammal v. Van de Kamp, 926 F.2d 918, 920 (9th Cir. 1991). "Only if there are *no* permissible inferences the jury may draw from the evidence can its admission violate due process. Even then, the evidence must 'be of such quality as necessarily prevents a fair trial.'" Id. (quoting Kealohapauole v. Simoda, 800 F.2d 1463, 1465 (9th Cir. 1986)).

Here, the trial court overruled the various objections to the video's admission based on two permissible inferences the jury could draw from the evidence: (1) that

1  the video demonstrates Petitioner's intent to steal a Rolex watch (the exact crime

2  that Petitioner was charged with committing in count 3, and attempting to commit

3  in count 6); and (2) that the video supports Petitioner's identity as the robber

4  because it links him to the iPhone used to orchestrate the crimes. Thus the appellate

5  court reasonably concluded that the video's admission did not violate Petitioner's

6  due process rights, and Petitioner's claim for habeas relief must fail.

7       In his objections to the initial R&R, Petitioner argues that he was deprived of

8  a fair trial because the "'racially inflammatory' content [of the video] allow[ed]

9  race to play a role in the juror's [sic] impression of petitioner which was highly

10  prejudicial." (Dkt. 35 at 6-7.) He cites <u>Dowling v. United States</u>, 493 U.S. 342

11  (1990), in which the Supreme Court emphasized that it has "defined the category of

12  infractions that violate 'fundamental fairness' very narrowly" and ultimately denied

13  relief, noting that the testimony at issue "was at least circumstantially valuable in

14  proving petitioner's guilt." <u>Id.</u> at 352-53. Given that the iPhone video at issue here

15  was also valuable to proving Petitioner's guilt, the Court finds that Petitioner's use

16  of the term "cracker" in the video was not so inflammatory as to implicate his right

17  to a fundamentally fair trial.

18  **E.**     **<u>GROUND FIVE: Petitioner Is Not Entitled to Relief on His Insufficiency</u>**

19       **<u>of the Evidence Claim.</u>**

20       Petitioner contends that there was insufficient evidence to support his

21  conviction for possession of marijuana for sale because (1) Petitioner had a valid

22  California medical marijuana card which allowed him to possess some marijuana

23  for personal use, and (2) the prosecution's expert witness was not qualified to

24  testify as to whether Petitioner's marijuana was likely possessed for the purposes of

25  sale. (Petition at 6.) The California Court of Appeal's rejection of Petitioner's

26  claim was reasonable, and the Court therefore recommends denying Petitioner's

27  claim.

28

## 1.    Relevant Trial Court Proceedings

The unpublished California Court of Appeal decision on Petitioner's direct appeal provides the following accurate account of the relevant trial court proceedings:

*The prosecution presented evidence that Petitioner was arrested with approximately 33 grams of marijuana in his underwear and over $1,300 in cash in his possession. Five containers of marijuana were discovered in a search of his bedroom, for a total of over 1,350 grams of marijuana. No paraphernalia for ingestion of marijuana were found in the search. Petitioner's friend, Scott Thenen, testified that Petitioner sold him approximately a quarter of an ounce of medical marijuana once or twice a week from the time they met in March 2010, until Petitioner's arrest. Thenen did not have a medical marijuana card.*

*Detective Saragueta testified as the prosecution's expert witness. Detective Saragueta had been a police officer for 17 years and was assigned to the narcotics division lab squad, which investigates clandestine drug laboratories. He worked primarily in the narcotics division for 10 or 11 years, had experience in narcotics sales, and had made hundreds of narcotics arrests. Defense counsel objected to Detective Saragueta giving opinion testimony because he was not qualified to do so based on this information alone, and the trial court agreed the evidence of qualification was "marginal." The prosecution questioned Detective Saragueta further about his experience over his years in narcotics. Detective Saragueta had worked in plain clothes making arrests for narcotics sales and undercover buying drugs, so that officers could arrest the sellers. He bought narcotics in this capacity over 700 times, and had testified over 100 times as an expert on the sale of narcotics. The defense objected on the same grounds, and the trial court overruled the objection.*

*Saragueta was questioned regarding his observations of individuals dealing in medical marijuana. He stated: "While working on observation posts or just in an*

*undercover capacity, you will see people coming into dispensaries and coming back*
*out and either they will go a short distance and sell what they have bought from a*
*dispensary or go back to a car and see them differently, set it up amongst 4 people*
*in the car." Over the hundreds of arrests he made, Detective Saragueta had*
*interviewed individuals involved in the illegal sale of medical marijuana. Detective*
*Saragueta had also made many undercover buys at medical marijuana collectives,*
*but had not done that for three to four years before trial.*

*Detective Saragueta did not know how much marijuana obtained at a*
*dispensary would cost. An average person would possess about an eighth of an*
*ounce of marijuana for personal use. Saragueta had no knowledge how much a*
*typical medicinal marijuana user would possess or how much a medical marijuana*
*user legally could possess in their home. He had no experience in arrests for*
*marijuana sales in the five years preceding trial. Detective Saragueta primarily*
*dealt with laboratories that manufactured drugs such as methamphetamine and*
*PCP.*

*Detective Saragueta opined the marijuana recovered from Petitioner and his*
*apartment was possessed for sale, based on the amount of marijuana recovered, the*
*cash in Petitioners wallet, Thenen's purchases from Petitioner on several*
*occasions, and the lack of paraphernalia for using marijuana.*

(LD 11 at 38-39; see also 6 RT 2197-2202; 7 RT 2756-87.)

### 2. The Court of Appeal's Decision.

The Court of Appeal rejected Petitioner's claim, reasoning that the trial court
did not abuse its discretion in permitting Detective Saragueta to testify as an expert,
and that substantial evidence supported Petitioner's conviction even in the absence
of Detective Saragueta's expert opinion. (LD 11 at 40-42.)

### 3. Applicable Federal Law.

The Due Process Clause of the Fourteenth Amendment protects a criminal
defendant from conviction "except upon proof beyond a reasonable doubt of every

fact necessary to constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 364 (1970); accord Juan H. v Allen, 408 F.3d 1262, 1274 (2005). Thus, a state prisoner who alleges that the evidence introduced at trial was insufficient to support the jury's findings states a cognizable federal habeas claim. Herrera v. Collins, 506 U.S. 390, 401-02 (1993). The prisoner, however, faces a "heavy burden" to prevail on such a claim. Juan H., 408 F.3d at 1274. Evidence is sufficient to support a conviction if, viewing all the evidence in the light most favorable to the prosecution, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979).

When determining the sufficiency of the evidence, a reviewing court makes no determination of the facts in the ordinary sense of resolving factual disputes. Sarausad v. Porter, 479 F.3d 671, 678 (9th Cir. 2007), vacated in part, 503 F.3d 822 (9th Cir. 2007), rev'd on other grounds, 555 U.S. 179 (2009). Rather, the reviewing court "must respect the province of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts by assuming that the jury resolved all conflicts in a manner that supports the verdict." Walters v. Maass, 45 F.3d 1355, 1358 (9th Cir. 1995); see also Jackson, 443 U.S. at 319, 324, 326.

While "mere suspicion or speculation cannot be the basis for the creation of logical inferences," Maass, 45 F.3d at 1358 (citation omitted), "[c]ircumstantial evidence can be used to prove any fact, including facts from which another fact is to be inferred, and is not to be distinguished from testimonial evidence insofar as the jury's fact-finding function is concerned." United States v. Stauffer, 922 F.2d 508, 514 (9th Cir. 1990) (citation omitted). Furthermore, "to establish sufficient evidence, the prosecution need not affirmatively rule out every hypothesis except that of guilt." Schell v. Witek, 218 F.3d 1017, 1023 (9th Cir. 2000) (en banc) (citation omitted).

62

In post-AEDPA cases, where, as here, a state court has issued a reasoned decision rejecting a claim of insufficient evidence under a standard that is not "contrary to" <u>Jackson</u>, a reviewing federal court applies an additional layer of deference. <u>Juan H.</u>, 408 F.3d at 1274. "[A] federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was objectively unreasonable." <u>Cavazos v. Smith</u>, 565 U.S. 1, 4 (2011) (per curiam); <u>see also</u> <u>Juan H.</u>, 408 F.3d at 1275 n.13. This "double dose of deference … can rarely be surmounted." <u>Boyer v. Belleque</u>, 659 F.3d 957, 964 (9th Cir. 2011); <u>see also</u> <u>Coleman v. Johnson</u>, 566 U.S. 650, 132 S. Ct. 2060, 2062 (2012) (per curiam) ("We have made clear that <u>Jackson</u> claims face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference").

In adjudicating an insufficiency of the evidence claim, a federal habeas court "look[s] to [state] law only to establish the elements of [the crime] and then turn[s] to the federal question of whether the [state court] was objectively unreasonable in concluding that sufficient evidence supported [the conviction]." <u>Juan H.</u>, 408 F.3d at 1278 n.14; <u>see also</u> <u>McCurdy v. Attorney General</u>, 229 F. App'x 665, 667 (9th Cir. 2007) (noting that courts look to state law "only to establish the elements of [the crime] and then turn to the federal question of whether the [state court] was objectively unreasonable in concluding that sufficient evidence supported the conviction") (citation omitted); <u>Chein v. Shumsky</u>, 373 F.3d 978, 983 (9th Cir. 2004) (en banc) ("The <u>Jackson</u> standard 'must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law.'" (quoting <u>Jackson</u>, 443 U.S. at 324 n.16)). In determining whether the evidence was sufficient, a federal court must follow the California courts' interpretation of state law. <u>Bradshaw</u>, 546 U.S. at 76.

### 4. The Court of Appeal's Rejection of Petitioner's Insufficiency of the Evidence Claim Was Not Objectively Unreasonable.

Under California law, a conviction for unlawful possession of marijuana for sale requires proof the defendant possessed marijuana with the intent of selling it and with knowledge of both its presence and illegal character. People v. Harris, 83 Cal.App.4th 371, 374 (2000). Intent to sell "may be established by circumstantial evidence" and reasonable inferences drawn from that evidence. Id.

Here, the appellate court reasonably found that Petitioner's possession of a medical marijuana card did not weaken the evidence supporting his conviction for possession of marijuana for sale. Scott Thenen, who had no prescription for medical marijuana, testified that he would consistently buy marijuana from Petitioner once or twice a week, and had been doing so since approximately March 2010. (LD 4, 6 RT 2197, 2201-02, 2212-13.) The Court of Appeal reasonably found that this was "undoubtedly evidence not to be expected in connection with the lawful use of drugs." (LD 11 at 42.)

Further, the appellate court found an array of facts strongly indicative of an intent to sell marijuana, independent of the expert's opinion: (1) Petitioner was arrested carrying 33.02 grams of marijuana in his underwear[11] (6 RT at 2186); (2) Petitioner was arrested with approximately $1,372 of cash on his person (6 RT at 2148-49); and (3) the search of Petitioner's house uncovered approximately 220.23 additional grams of marijuana,[12] with but no paraphernalia for ingesting the drug.[13] (6 RT at 2149-55, 2173, 2525.) Based on these facts, in particular on the "amount and the unusual and secretive location of the marijuana," the appellate court

---

[11] 33.02 grams of marijuana is approximately one full quart-sized plastic bag.

[12] 220.23 grams is approximately a half of a pound of marijuana, or one full gallon-sized plastic bag.

[13] For example, there were no water pipes, rolling papers, lighters, etc.

reasonably concluded that, even in the absence of Detective Saragueta's expert opinion, a reasonable trier of fact could find Petitioner guilty of the crime of possession of marijuana with intent to sell beyond a reasonable doubt. [14] Id.

In his objections to the initial R&R, Petitioner argues, "The amount of marijuana possessed by petitioner or, the discovery of its location did not in and of itself amount to intent to sell." (Dkt. 35 at 7.) However, as discussed above, there was other circumstantial evidence further indicating Petitioner's intent to sell.

For these reasons, the Court of Appeal did not apply Jackson in an objectively unreasonable way, and Petitioner is not entitled to habeas relief on Ground Five.

## F.    GROUND SIX: Petitioner Is Not Entitled to Relief on His Cumulative Error Claim.

Petitioner contends that the cumulative effect of the "foregoing" errors (Grounds One through Five) deprived him of his constitutional rights to due process and a fair trial. (Petition at 7.) The Court of Appeal reasonably rejected this claim, explaining that based on its determination that the trial court did not err, the assertion of cumulative error "necessarily fails." (LD 11 at 43.)  This Court has rejected all of the claims of constitutional trial error alleged in the Petition. Thus, this Court necessarily finds that the Court of Appeal's rejection of Petitioner's cumulative error claim was neither contrary to, nor involved an unreasonable application of, clearly established federal law.  See Fairbank v. Ayers, 650 F.3d 1243, 1257 (9th Cir. 2011) ("[B]ecause we hold that none of [petitioner]'s claims rise to the level of constitutional error, there is nothing to accumulate to a level of constitutional violation") (citation omitted).

---

[14] Because the appellate court reasonably found that a rational trier of fact could have convicted Petitioner of the offense of possession of marijuana for sale even in the absence of the Detective's testimony, this Court need not consider Petitioner's claim that Detective Saragueta was unqualified to opine as an expert.

**G.     GROUNDS EIGHT, NINE, AND TEN: Petitioner's Claims Are Procedurally Barred.**

As explained in Section V, <u>supra</u>, the California Court of Appeal denied habeas relief on Grounds Eight, Nine, and Ten on an independent and adequate state law ground, i.e., that Petitioner failed to raise these claims on direct appeal. In order to overcome the presumption that these claims are procedurally barred, Petitioner must show either cause for the default and prejudice resulting from it, or a fundamental miscarriage of justice.  See <u>Coleman</u>, 501 U.S. at 750.

Petitioner has not shown cause for the default.  He attributes his default to ineffective assistance of counsel (<u>see</u> Dkt. 30 at 7; Dkt. 35 at 8), but as explained below in regards to Grounds Eleven and Twelve, his IAC claims fail and therefore cannot show cause.  See <u>Murray v. Carrier</u>, 477 U.S. 478, 492 (1986) ("Attorney error short of ineffective assistance of counsel does not constitute cause for a procedural default even when that default occurs on appeal rather than at trial.").

Nor has Petitioner shown that default would cause a fundamental miscarriage of justice. The "miscarriage of justice" exception is limited to habeas petitioners who can show, based on "new reliable evidence," that "'a constitutional violation has probably resulted in the conviction of one who is actually innocent.'"  <u>Schlup v. Delo</u>, 513 U.S. 298, 324-27 (1995) (quoting <u>Murray</u>, 477 U.S. at 496).  Here, Petitioner argues for the first time in his traverse that he is "actually innocent." (<u>See</u> Dkt. 30 at 5.)  He does not provide the Court with any "new reliable evidence" that he is actually innocent.  Grounds Eight, Nine, and Ten are procedurally barred.

**H.     GROUND ELEVEN: The California Court of Appeal Had a Reasonable Basis for Denying Petitioner's Trial IAC Claim.**

Petitioner claims that trial counsel rendered IAC by not objecting to the iPhone video as containing prejudicial racial comments. As the California Court of Appeal did not address this claim on habeas review, the Court must determine whether there was any "reasonable basis for the state court to deny relief."  <u>Richter</u>,

66

562 U.S. at 98.

Under the standard set out in Section VI.B.4.a, <u>supra</u>, the state appellate court had a reasonable basis to deny relief. Petitioner has not shown any reasonable probability that, but for his trial counsel not objecting more specifically on "racial prejudice" grounds, the result of the proceeding would have been different. In fact, Petitioner's trial counsel did object to the tape, specifically on the ground that its probative value was outweighed by its prejudicial effect. The trial court simply concluded (and this Court agrees) that the tape's probative value was extremely high. It is almost certain, therefore, that the trial court would have still admitted the tape, even if Petitioner's counsel had been more specific about his objections. Furthermore, even apart from the tape, there was ample evidence tying Petitioner to the crime, including eyewitness testimony. Thus, even without the tape, it is extremely likely that the jury would have found Petitioner guilty. Petitioner's trial IAC claim fails.

## I. GROUND TWELVE: The California Court of Appeal Reasonably Rejected Petitioner's Appellate IAC Claim.

The California Court of Appeal had a reasonable basis for rejecting Petitioner's appellate IAC claim. The <u>Strickland</u> standard applies when considering claims regarding the effective assistance of appellate counsel. <u>Smith v. Robbins</u>, 528 U.S. 259, 285 (2000). Appellate counsel does not act unreasonably in failing to raise a meritless claim. <u>Moormann v. Ryan</u>, 628 F.3d 1102, 1107 (9th Cir. 2010). Thus, the Court must look to the merits of the omitted issues on direct appeal. <u>Id.</u>

In Claim Eight, Petitioner argues that the trial court's sua sponte instruction on aiding and abetting as to the robbery of Setiabudi violated his rights to due process and a fair trial, because the evidence did not support that instruction.[15] The

---

[15] The Setiabudi robbery was the only robbery count to which an aiding and abetting theory would have applied. (<u>See</u> 8 RT 3126-28 [trial court's discussion of

Court disagrees that the evidence did not support the instruction. Under California law, a person is liable as an aider and abettor "when he or she aids the perpetrator of an offense, knowing of the perpetrator's lawful purpose and intending, by his or her act of aid, to commit, encourage, or facilitate commission of the offense." People v. Montoya, 7 Cal. 4th 1207, 1039 (1994). The prosecution presented evidence that the robber used Petitioner's phone to set up the robbery (5 RT 1573-78; 7 RT 2480); the victim identified the gun used to rob him as one found in Petitioner's home (5 RT 1603); and the victim identified Petitioner's voice as the person who called him about the Rolex in the first place (5 RT 1587-88; 7 RT 2485-86.) This evidence would have been sufficient to support Petitioner's robbery conviction under an aiding and abetting theory. See Jackson, 443 U.S. at 319.

Even assuming that the evidence did not support the instruction, the United States Supreme Court has held that it is no violation of due process "that a trial court instructed a jury on two different legal theories, one supported by the evidence, the other not." Sochor v. Florida, 504 U.S. 527, 538 (1992) (citing Griffin v. United States, 502 U.S. 46 (1991)). Here, the trial court instructed the jury on two theories of liability for robbery: direct perpetrator and aider and abettor. (See 2 CT 424-25; 9 RT 3512-13.) Setiabudi identified a photograph of Petitioner as looking like the robber and identified Petitioner's voice as that of the robber. (See 5 RT 1590-99, 1612; 7 RT 2485-86.) This evidence sufficiently supported a direct perpetrator instruction, and the Court has found no authority supporting Petitioner's argument that the trial court's actions violated Petitioner's constitutional rights.

In Claim Nine, Petitioner argues that the trial court's admission of a photograph lineup was unduly suggestive, violating Petitioner's rights to due process and a fair trial. Varma testified at trial that the robber wore a white tank-top, and the police had shown Varma a six-pack line-up in which Petitioner was the

_____

the instruction as applied to the Setiabudi robbery].)

only individual wearing this type of shirt. (See 4 RT 1359, 1368-69; 5 RT 1501-10.)  Due process concerns as to a pretrial identification "arise only when law enforcement officers use an identification procedure that is both suggestive and unnecessary." Perry, 565 U.S. at 238-39. As explained in Section VI.C.3, supra, if a pretrial procedure is impermissibly suggestive, then the court must determine whether "under the totality of the circumstances the identification is sufficiently reliable." Bagley, 772 F.2d at 492. Here, even assuming the pretrial procedure was impermissibly suggestive, Varma's identification was sufficiently reliable. Varma testified that he chose the photograph of Petitioner based on his facial features, not Petitioner's clothing, and that he was "80 percent" certain of the identification.  (5 RT 1509-10, 1546.) Furthermore, even if Varma's identification was not sufficiently reliable, Petitioner has not shown that excluding Varma's identification would have had a substantial and injurious effect or influence on the jury's verdict. See Brecht v. Abrahamson, 507 U.S. 619, 638 (1993).

In Claim Ten, Petitioner argues that there was insufficient evidence to support Petitioner's robbery under an aiding and abetting theory. As explained above with respect to Claim Eight, the Court disagrees.

As for Claim Eleven, as explained in Section V.H, supra, Petitioner's trial IAC claim fails. Petitioner's appellate counsel therefore could not have rendered ineffective assistance by failing to raise that issue. See Moormann, 628 F.3d at 1107.

//
//
//
//
//
//
//

**VII.**

**RECOMMENDATION**

IT IS THEREFORE RECOMMENDED that the District Judge issue an Order: (1) accepting this Report and Recommendation, and (2) directing that Judgment be entered denying the Petition and dismissing this action with prejudice.

Dated: <u>November 15, 2017</u>

_Karen E. Scott_

KAREN E. SCOTT
United States Magistrate Judge

**<u>NOTICE</u>**

Reports and Recommendations are not appealable to the Court of Appeals, but are subject to the right of any party to timely file Objections as provided in the Federal Rules of Civil Procedure and the instructions attached to this Report. This Report and any Objections will be reviewed by the District Judge whose initials appear in the case docket number.